Argued 16 November; decided 26 December, 1899.

### QUINN *v.* LADD.

[59 Pac. 457.]

CURTESY UNDER THE COMMON LAW.

1. To enable a husband to claim a curtesy estate under the common law it was essential that his wife have died owning an estate of inheritance in the land in question.

WHEN ESTATES BECAME VESTED UNDER THE DONATION ACT.

2. Under the Donation Land Law (act Cong. 27 Sept. 1850), a settler on the public domain did not acquire in the land which he claimed any estate, but only a

right of possession, until he had completed the residence and cultivation required by law, and of course his wife could not have any greater estate than he had: *Farris* v. *Hayes*, 9 Or. 81, applied.

RIGHT OF ALIEN TO INHERIT LAND AT COMMON LAW.

8. Under the common law an alien could not acquire real property by operation of law, though he had previously declared his intention to become a citizen, and subsequently was naturalized.

From Multnomah : LOYAL B. STEARNS, Judge.

This is a suit in equity brought by Mary E. Quinn against the widow and heirs of W. S. Ladd, deceased, to impeach and set aside certain decrees of the county and circuit courts of Multnomah County on the grounds of fraud and want of jurisdiction, and for a decree declaring her to be the owner, and entitled to the possession, of a tract of land in the north half of the donation claim of Terence Quinn and wife, near the City of Portland, containing 84.21 acres, which was by such decrees adjudged to be the property of her father, Terence Quinn, and set off to him. The facts material to the view we take of the case may be stated thus : In December, 1851, Terence Quinn, an alien who had declared his intention to become a citizen of the United States, settled, under section 5 of the act of congress of September 27, 1850, commonly known as the "Donation Law," with his wife, Mary, upon three hundred and twenty acres of land, in Multnomah County. On March 7, 1854, and before the completion of the four years' residence and cultivation, Mary died, leaving the plaintiff, then an infant a few months old, as her sole child and heir at law. Thereafter Terence Quinn completed the required residence and cultivation, and on December 15, 1855, made final proof. On July 25, 1856, he was duly naturalized, and on October 27, 1860, received the final certificate for a patent ; and on January 24, 1866, a patent conforming thereto was duly issued, conveying to Terence Quinn and

his heirs the south half, and to "his wife, the said Mary Quinn, and to her heirs," the north half, of the donation claim. On January 13, 1858, Terence Quinn, tó secure the payment of a promissory note for $1,500, executed a mortgage to F. N. Blanchet upon the whole claim, and this mortgage was, on the nineteenth of March, 1859, sold and assigned by Blanchet to one Meriam. On June 6, 1860, John Quinn, a brother of Terence, who had been appointed by the County Court of Multnomah County guardian of the plaintiff, then about six years old, filed a petition in the guardianship proceedings averring, in substance, that his ward and her father, Terence Quinn, were the owners, as tenants in common, of the north half of the claim, and praying for the appointment of commissioners to partition it between them. Terence appeared in such proceedings, and commissioners were appointed, who thereafter partitioned the same, setting aside 75.98 acres to the plaintiff, and 84.42 acres to her father. On September 4, 1860, the report of the commissioners was confirmed by the county court, and a decree entered apportioning the land between the plaintiff and her father in accordance therewith.

On February 13, 1861, Meriam commenced a suit to foreclose the Blanchet mortgage, and thereafter obtained a decree therein, under which he became the purchaser of the mortgaged premises, and on the second day of November, 1862, received a sheriff's deed therefor. On February 27, 1863, he commenced a suit in the Circuit Court of Multnomah County against the plaintiff and her guardian, in which he alleged, in substance, that prior to the date of the Blanchet mortgage Terence Quinn had filed his notification in the land office at Oregon City claiming the north half of the claim for himself, and the south half for his wife, but that after the execution of the mortgage he had fraudulently and wrongfully, and

with intent to injure the mortgagee, caused the notification to be changed so as to set apart the north half, or improved portion, of the claim to the heirs of his wife, and the south half to himself; that the plaintiff was a minor of about the age of eight years, and was at the time in San Francisco, and that her guardian, John Quinn, was not in the State of Oregon, but "somewhere in the mining regions of Washington Territory;" and in such suit asked for a decree adjudging him to be the owner in fee of the north half of the claim, and entitled to the possession, use, occupation, rents, issues and profits of the south half, as the assignee and representative of the rights of Terence Quinn as tenant by the curtesy. No summons or process was ever served upon the plaintiff or her guardian, nor was any one authorized to appear for them, but an attorney, who testifies that he was retained by Terence Quinn, filed an answer denying the fraud charged in the complaint, and averring that the plaintiff and her father were the owners, as tenants in common, of the north half of the donation claim, and setting up the proceedings for partition had in the county court, and asking that the same be confirmed, expressly disclaiming any interest in any portion of the donation claim other than that set off to the plaintiff by the decree of the county court. Subsequently, on motion of such attorney, a decree was entered upon the answer taken as confessed, adjudging that the plaintiff in this suit was the owner of that portion of the north half of the donation claim set apart to her by the commissioners appointed by the county court, and that Meriam was the owner and entitled to the possession of the remainder of the donation claim. On September 16, 1869, W. S. Ladd purchased of Meriam the south half of the claim, and that portion of the north half decreed to belong to him by the Circuit Court of Multnomah

County in the suit referred to, and immediately entered into possession, and he and his heirs have continued in the actual, open, notorious and exclusive possession thereof ever since that time, claiming title.

On September 4, 1890, Terence Quinn died, and this suit was commenced in 1895. The complaint alleges that the proceedings in the county and circuit courts, already referred to, were had and done by Terence Quinn, the father of the plaintiff, for the purpose and with the intent of defrauding her out of her interest in her mother's half of the donation claim, and that W. S. Ladd was a party to, and participated in, such fraud. The answer denies the allegations of the complaint in this respect, and sets up title in the defendants through the Blanchet mortgage, the foreclosure thereof, and the proceedings of the county and circuit courts, and also pleads the statute of limitations. After the issues were made up, the case was referred to J. V. Beach, Esq., who, after hearing the testimony, filed a report in favor of defendants, which was confirmed by the circuit court, and the plaintiff appeals.                    AFFIRMED.

For appellant there was a brief over the names of *Lawrence A. McNary, Nixon & Dolph, William W. Thayer,* and *Henry St. Rayner*, with an oral argument by *Messrs. McNary, St. Rayner*, and *Chester V. Dolph*.

For respondents there was a brief over the names of *Dolph, Mallory & Simon* and *Williams, Wood & Linthicum,* with an oral argument by *Messrs. Joseph Simon* and *Stewart B. Linthicum*.

Mr. Justice Bean, after stating the facts, delivered the opinion of the court.

It is claimed on behalf of the plaintiff that by reason of the settlement of her father, Terence Quinn, and her mother, Mary, upon the land in question, under section 5 of the donation law, and the subsequent issuance of a patent by the government of the United States conveying the north half of the claim, which includes the lands in controversy, to her mother and her heirs, she became the owner thereof, and that the proceedings in the county and circuit courts to devest her of the title to a portion of the same are void and of no effect, (1) because of fraud, and (2) for want of jurisdiction in the respective courts to render such decrees.

In regard to the allegations charging W. S. Ladd with fraud, it is sufficient to say that they are not supported by any evidence whatever. There is no testimony showing, or tending to show, that he was a party to, or had knowledge at any time of, such alleged fraud. It is true he was not only chargeable with constructive notice of the proceedings in the county and circuit courts, and any defect therein, but he had actual knowledge thereof, because the deed from Meriam to him of September 16, 1869, recited such proceedings, and that the land therein conveyed was the property referred to in the mortgage to Blanchet and in the subsequent proceedings for partition in the circuit court of Multnomah County. But there is no proof of fraud on his part the concealment of which would toll the statute of limitations. The first question for our consideration, therefore, is whether this suit is barred by the statute.

1. It will be observed, from the statement, that plaintiff became of age more than twenty years before the commencement of the suit, but she claims that her father,

Terence Quinn, had an estate by the curtesy in the north half of the claim, which terminated only at his death, in September, 1890, and that prior to that time the statute did not commence to run as against her. In answer to this position, it is contended by defendants that Terence Quinn never had an estate by the curtesy in the north half of the claim, because (1), as his wife died before the completion of the four years residence and cultivation required by the donation law, she did not have an estate of inheritance in the property ; and (2), if she did, he was an alien, and under the common law, which was then in force, could not acquire real property by operation of law. At the death of Mary Quinn, in March, 1854, there was no statute providing for the descent of real property nor defining an estate by the curtesy. The acts of December 14, 1853 (Laws, 1854–55, p. 379), and January 16, 1854 (Laws, 1854–55, p. 405), did not take effect until the first of the following May. The question, therefore, as to whether Terence Quinn had an estate by the curtesy in his wife's half of the donation claim must be determined by the common law. And at common law it was one of the essential requisites to entitle the husband to curtesy that the wife should be seised during coverture of an estate of inheritance : 1 Washburn, Real Prop. 169–174. And an estate of inheritance is one which descends or may descend to the heir upon the death of the ancestor : 10 Am. & Eng. Enc. Law (1 ed.), 777. Unless, therefore, Mrs. Quinn was possessed of an estate on the north half of the donation claim at the time of her death which would descend to her heirs, it is manifest that her husband did not take an estate by the curtesy therein. This brings us to a consideration of the rights of the wife of a settler under the donation law prior to the completion of the four years residence and cultivation required by that act.

2. For many years after its enactment, it was held by

this court (*Lee* v. *Summers*, 2 Or. 260 ; *Delay* v. *Chapman*, 3 Or. 459 ; *Dolph* v. *Barney*, 5 Or. 191 ; *Love* v. *Love*, 8 Or. 23), and by the inferior federal courts (*Chapman* v. *School Dist.* Deady, 108, Fed. Cas. No. 2607 ; *Adams* v. *Burke*, 3 Sawy. 415, Fed. Cas. No. 49 ; *Hall* v. *Russell*, 3 Sawy. 506, Fed. Cas. No. 5943 ; *Alexander* v. *Knox*, 6 Sawy. 54, Fed. Cas. No. 170), that the donation act was a grant *in præsenti*, and vested in the settler an estate in fee from the filing of his notification, subject to be defeated by his noncompliance with the requirements of the act. But this view was not accepted by the Supreme Court of the United States, and its decision is, of course, controlling. The question came before that court in 1879, in *Hall* v. *Russell*, 101 U. S. 503, and, after an elaborate considera- tion of the nature of the grant, it was held that it did not take effect so as to pass anything more than a possessory right in the lands occupied until the completion of the four years' residence and cultivation, and full compliance with all the other conditions of the act. After citing the rule laid down in a previous decision for the construc- tion of congressional grants, Mr Chief Justice WAITE, speaking for the court, said : ''There cannot be a grant unless there is a grantee, and consequently there cannot be a present grant unless there is a present grantee. If, then, the law making the grant indicates a future grantee, and not a present one, the grant will take effect in the future, and not presently. In all the cases in which we have given these words the effect of an immediate and present transfer, it will be found that the law has desig- nated a grantee qualified to take, according to the terms of the law, and actually in existence at the time. * . * . * Coming, then, to the present case, we find that the grantee designated was any qualified 'settler or occupant of the public lands * * * who shall have resided upon and cultivated the same for four consecutive years, and shall

otherwise conform to the provisions of the act.' The grant was not to a settler only, but to a settler who had completed the four years of residence, etc., and had otherwise conformed to the act. Whenever a settler qualified himself to become a grantee, he took the grant, and his right to a transfer of the legal title from the United States became vested. But, until he was qualified to take, there was no actual grant of the soil. The act of congress made the transfer only when the settler brought himself within the description of those designated as grantees. A present right to occupy and maintain possession, so as to acquire a complete title to the soil, was granted to every white person in the territory having the other requisite qualifications, but beyond this nothing passed until all was done that was necessary to entitle the occupant to a grant of the land." And consequently a settler had no estate in the land prior to the completion of the four years' residence and cultivation, which he could devise, sell, or transfer, or which would descend to his heirs. Accordingly, it was held by this court in *Farris* v. *Hayes*, 9 Or. 81, that a wife was not entitled to dower in her husband's half of the donation claim when he died before the completion of the four years' residence and cultivation. It must be regarded, therefore, as authoritatively determined that a settler, under the donation law, did not acquire an estate of inheritance in the land until the completion of the required residence and cultivation, and a full compliance with the other conditions of the act.

And in *Vance* v. *Burbank*, 101 U. S. 514, it was held that a wife acquired no greater interest in the land than her husband. In that case the husband had been defeated in a contest over a portion of the claim before the land department, and it was contended by the heirs of the wife that she was not bound by the decision. The court, however, held this position unsound, saying: "The

statutory grant was to the settler, but, if he was married, the donation, when perfected, inured to the benefit of himself and his wife, in equal parts. The wife could not be a settler. She got nothing except through her husband. If he abandoned the possession before he became entitled to the grant, her estate in the land was gone as well as his.   *   *   *   His acts affecting the claim are her acts; his abandonment, her abandonment; his neglect, her neglect. As her heirs must claim through her, whatever would bar her will necessarily bar them. The land department, until the final proofs are made, knows only the husband. If contests arise, he is the party to be notified. He represents the claim, and whatever binds him binds all interested through him in the questions to be decided. For this reason, whatever might have been the rights of the children of Mrs. Scott, if the claim had been successfully 'proved up,' their father was their representative in making the proof, and they must abide the consequences of what he did or omitted to do in their behalf. It follows that, notwithstanding the infancy of the children, the decision of the land department concludes them as well as their father." This doctrine was reaffirmed and applied in the case of *Maynard* v. *Hill*, 125 U. S. 190 (8 Sup. Ct. 723) where the husband and wife were divorced after the settlement, but before the completion of the four years' residence, and it was held that such divorce terminated the wife's interest in the claim, although the husband subsequently completed the necessary residence and cultivation, and made the proof required by the donation law. Mr. Justice FIELD, after referring to and quoting with approval the doctrine of *Hall* v. *Russell*, and *Vance* v. *Burbank*, said : "When, therefore, the act was passed divorcing the husband and wife, he had no vested interest in the land, and she could have no interest greater than his. Nothing had then been acquired by his resi-

dence and cultivation, which gave him anything more than a mere possessory right to remain on the land so as to enable him to comply with the conditions upon which the title was to pass to him. After the divorce she had no such relation to him as to confer upon her any interest in the title subsequently acquired by him. A divorce ends all rights not previously vested. Interests which might vest in time, upon a continuance of the marriage relation, were gone. A divorced wife has no right of dower in his property. A husband divorced has no right by the curtesy in her lands, unless the statute authorizing the divorce specially confers such right. It follows that the wife was not entitled to the east half of the donation claim. To entitle her to that half, she must have continued his wife during his residence and cultivation of the land.''

The conclusion is irresistible, from the doctrine of these cases, that at the time of the death of Mrs. Quinn her husband had a bare possessory right to the claim for the purpose of complying with the requirements of the donation law, and that neither of them had an estate of inheritance therein. It is true, these decisions were all made in cases involving the construction of section 4 of the donation law, but in this regard there is no material difference between the provisions of that section and section 5, unless, indeed, as stated by the chief justice in *Hall* v. *Russell*, the intention of congress is even more distinctly shown in section 5 than in section 4. He says, in speaking of section 5: ''There the language is 'that to all white male citizens  *  *  *  who shall in all other respects comply with the foregoing section  *  *  *  there shall be and hereby is granted,' etc. This indicates clearly that there was to be no grant except to persons who, by complying with the provisions of the act, had qualified themselves to take.'' We conclude, there-

fore, that, at the time of her death, Mrs. Quinn was not possessed of an estate of inheritance in the land, and therefore her husband did not take an estate by the curtesy. Nor can the subsequent issuance of a patent conveying the north half of the claim "to Mary Quinn, and to her heirs," it seems to us, be held to have vested her, by relation or otherwise, with an estate in fee at the time of her death, because, under the donation law, she had no such estate at the time. The most that can be claimed for the patent is that, under the act of congress of 1836 (Section 2448, Rev. Stat. U. S.), it conveyed the title to her "heirs, devisees, or assignees :" *Davenport* v. *Lamb*, 80 U. S. (13 Wall.) 418. These views lead to the conclusion that the plaintiff's suit is barred by the statute of limitations.

3. But there is yet another reason why it would seem that plaintiff's father did not take an estate by the curtesy, even if his wife had an estate of inheritance at the time of her death: At that time he was an alien, and under the common law, which was then in force here, could not acquire real property by operation of law : 2 Am. & Eng. Enc. Law (2 ed.), 70, and authorities there cited. And his previously declared intention to become a citizen, and subsequent naturalization, do not take this case out of the rule. This question was decided by the Supreme Court of Massachusetts in *Foss* v. *Crisp*, 20 Pick. 121. Crisp, who was an alien and a native of Spain, had made his primary declaration of intention to become a citizen of the United States before the death of his wife, and was in fact naturalized thereafter, and the question presented was whether or not he was entitled to hold the premises belonging to his wife as a tenant by the curtesy. The court, after quoting the doctrine laid down by Chief Justice Shaw, in *Wilbur* v. *Tobey*, 16 Pick. 179, "that an alien can take real estate, by deed or de-

vise, or other act of purchase, but cannot hold against
the commonwealth; he therefore takes a defeasible es-
tate, good against all except the commonwealth, and good
against them, until they institute proceedings, and obtain
a judgment by inquest of office; but an alien cannot take
by act of law, as descent, because the law will be deemed
to do nothing in vain, and therefore it will not cast the
descent upon one who cannot by law hold the estate;"
and stating that it is maintained by all the books, pro-
ceeds to say: "But it has been contended for the tenant
that, by the making of his declaration of his intent to
become a citizen, he had an inchoate right to citizenship
in the life of his wife, and, as it was completed after her
death, it should relate back, so that the disability of
alienage should be removed from the time of making
and filing his preliminary declaration. This argument
is answered by the statute of the United States (Chapter
XLVII), passed on March 26, 1804. The provision is
that where an alien shall die after he has made his pre-
liminary declaration, and 'before he is actually natural-
ized, the widow and the children of such alien shall be
considered as citizens of the United States, and shall be
entitled to all rights and privileges, as such, upon taking
the oaths prescribed by law.' But it is very clear that
the alien himself does not become a citizen until he is
actually naturalized. Until that time the common-law
disabilities of alienage continue, except as they are re-
laxed in favor of his widow and children by the statute
of the United States, as is above stated." To the same
effect are *Keenan* v. *Keenan*, 7 Rich. 345; *White* v. *White*,
2 Metc. (Ky.) 185, 189; *Crane* v. *Reeder*, 21 Mich. 24, 70
(4 Am. Rep. 430); *Heney* v. *Brooklyn Benev. Soc.* 39 N.
Y. 333, 336. We are therefore of the opinion that plain-
tiff's cause of suit is barred by the statute of limitations,

and this conclusion renders an examination of the other questions in the case unnecessary, and the decree of the court below is affirmed.          AFFIRMED.