PARR et al. v. UNITED STATES et al.

(Circuit Court, D. Oregon. May 6, 1907.)

No. 2,844.

1. JUDGMENT—ESTOPPEL—JURISDICTION.

Where a state court had no jurisdiction to determine heirship for the purpose of fixing the right of descent to an allotment on the Umatilla reservation, while the land was held in trust by the United States for the heirs of the allottee, the state court's judgment in such proceeding did not operate as an estoppel in a subsequent proceeding by the allottee's surviving husband for curtesy.

[Ed. Note.—Conclusiveness as between federal and state courts, see note to Kansas City, Ft. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468.]

2. INDIANS—INDIAN LANDS—ALLOTMENT—CURTESY.

Indian Treaty June 9, 1855, 12 Stat. 945, constituted a cession of the Umatilla Indian reservation to the United States, and authorized the President to provide a permanent home for such Indians in his discretion. Act March 3, 1885, c. 319, 23 Stat. 340, provided for the allotment of lands in such reservation to Indians in severalty according to the size of the families, etc. The act provided for the issuance of patents for the allotments, but that the legal title should be held in trust by the United States for the allottee and his heirs for 25 years in fee, provided that the law of alienation and descent in force in the state of Oregon should apply after the issuance of patents. B. & C. Comp. Or. § 5544, provides that, when a man and his wife shall be seised in her right of any estate of inheritance in lands, the husband shall, on the death of his wife, hold the lands for life as tenant by the curtesy, etc. *Held* that, where land was allotted

to an Indian woman within such reservation, her surviving husband was entitled to curtesy therein, though the legal title still remained in the United States under such trust.

## On Motion to Strike Further and Separate Answers.
See 132 Fed. 1004.

On about April 12, 1893, there was allotted to Maggie Damain, a mixed-blood Indian woman, who was at the time the wife of John Damain, the northeast quarter of section 26, township 3 north, range 34 east of the Willamette Meridian, situated within the Umatilla Indian reservation. Subsequently the Damains adopted Ellen Rainville, an Indian child, through proceedings duly had and instituted in the county court for Umatilla county, state of Oregon, who later married Fred Parr. About June 27, 1894, Maggie Damain died intestate, leaving as her heirs at law her son, Isaac Gober; a daughter, Rosa Gober (sometimes called Rosa Farrow, now Rosa Parr); and her adopted daughter, Ellen Parr. Isaac Gober died, leaving as his heirs at law Rosa Gober and Ellen Parr. Since the death of Maggie Damain, John Damain, her husband, has been collecting the rents, issues, and profits of the land allotted to his wife, to the exclusion of her daughters. It is complained by Ellen Parr, who with her husband brings this suit, that she and Rosa Parr are the only heirs at law of Maggie Damain, and that they are entitled to the rents, issues, and profits of the allotment, to the exclusion of John Damain, the widower.

Damain has answered the bill of complaint, and claims that, under the act providing for the allotment of Indian lands upon the Umatilla reservation, he is entitled to curtesy or a life estate in the lands of his wife, and that, by reason of such right, he has been collecting the rents and profits of the allotment in question; but that he has been providing, also, for Ellen and Rosa Parr out of such rents. By a first further and separate answer he sets out the facts necessary to show that he was the husband of Maggie Damain, and that, by reason of such fact, he is entitled to the rents. By a second further and separate answer, he sets up a decree, given and rendered in the circuit court of the state of Oregon for the county of Umatilla, in a case wherein Rosa Farrow and John Damain were plaintiffs, and Isaac Gober and Ellen Damain were defendants, wherein it was decreed that Damain was entitled to a life estate by curtesy in the premises, and therefore entitled to collect the rents and profits, which decree is pleaded, as an estoppel to the present suit. And he prays, therefore, that he be declared to be entitled to hold said land for and during his natural life, and to the rents, issues, and profits arising therefrom, and for other relief.

The plaintiffs moved to strike out these two further and separate answers, not separately, but as a whole, and the motion is now submitted for determination.

R. J. Slater, J. H. Raley, and Charles H. Carter, for plaintiffs.

W. C. Bristol, U. S. Atty.

Hailey & Lowell, for defendant Rosa Parr.

H. J. Bean and James A. Fee, for defendants John Damain and George E. Peringer.

WOLVERTON, District Judge (after stating the facts). The first question I will consider is whether the decree given and rendered in the state court operates as an estoppel to the present suit. Since this case was argued, the cause of William McKay (substituted for Mary Kalyton) et al., Plaintiffs in Error v. Agnes Kalyton, by Louise Kalyton, her Guardian ad litem, 27 Sup. Ct. 346, 51 L. Ed. ——, has been decided by the Supreme Court of the United States, and it was there considered that the state court is without jurisdiction to determine the heirship, under Act March 3, 1885, c. 319, 23 Stat. 340, under

which the allotments were made to the Indians upon the Umatilla reservation. The court held that, prior to the act of Congress of 1894, all controversies necessarily involving the determination of the title, and, incidentally, of the right of possession, of Indian allotments, while they were held in trust by the United States, were not primarily cognizable by any court, either state or federal, and that the result of the act of Congress which delegated to the courts of the United States the power to determine such questions cannot be construed as having conferred upon the state courts the authority to pass upon federal questions over which, prior to the act of 1894, no court had any authority. Hence it was determined, as previously indicated, that the state court had no authority in that case to adjudicate touching the heirship as it respects Indian allottees. That case is preclusive, therefore, of any further controversy on the question in this case, and it is plain that the plea cannot operate as an estoppel to the present suit.

The next and only other question for determination is whether the husband of a deceased Indian woman, she being an allottee of land upon the Umatilla Indian reservation, has a right of curtesy in and to his wife's allotment. This depends upon the allotment act of March 3, 1885, providing for allotments to Indians upon such reservation, and the laws of the state of Oregon governing curtesy and descent of real property. By the act of 1885, the President of the United States is authorized to cause lands to be allotted to the confederated bands of Cayuse, Walla Walla, and Umatilla Indians residing upon the Umatilla reservation, in the state of Oregon, as follows, of agricultural lands:

"To each head of a family, one hundred and sixty acres; to each single person over the age of eighteen years, eighty acres; to each orphan child being under eighteen years of age, eighty acres; and to each child under eighteen years of age not otherwise provided for, forty acres.

"Allotments to heads of families and to children under eighteen years of age belonging to families shall be made upon the selections made by the head of the family."

The act further provides for the appointment of a commission to set aside certain portions of the reservation for the purpose of allotments to the Indians residing upon such reservation, and then as follows:

"As soon as such surveys are approved the selections and allotments shall be made. The President shall cause patents to issue to all persons to whom allotments of lands shall be made under the provisions of this act, which shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or in case of his decease, of his heirs according to the laws of the state of Oregon, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, that the law of alienation and descent in force in the state of Oregon shall apply thereto after patents have been executed, except as hereinotherwise provided."

By section 5 of the act it is further provided:

"That before this act shall be executed in any part, the consent of said Indians shall be obtained to the disposition of their lands as provided herein, which consent shall be expressed in writing and signed by a majority of the male adults upon said reservation, and by a majority of their chiefs in

council assembled for that purpose, and shall be filed with the Secretary of the Interior."

By the laws of the state of Oregon (section 5544, B. & C. Comp.) it is provided that:

"When any man and his wife shall be seised in her right of any estate of inheritance in lands, the husband shall, on the death of his wife, hold the lands for his life, as tenant thereof by the curtesy, although such husband and wife may not have had issue born alive."

By section 5577 that:

"When any person shall die seised of any real property, or any right thereto, or entitled to any interest therein, in fee simple or for the life of another, not having lawfully devised the same such real property shall descend subject to his debts, as follows: (1) In equal shares to his or her children, and to the issue of any deceased child by right of representation," etc.

And by section 5589 that:

"Nothing contained in this and the preceding chapter shall affect or impair the estate of a husband as tenant by the curtesy nor that of a widow as tenant in dower."

After the Indians had signified their consent that the lands of the reservation should be allotted as contemplated by the act, commissioners were appointed by the President, and allotments were made, resulting in the setting aside of the tract herein involved to the Indian woman Maggie Damain.

In order to a clear understanding of the major premise from which must be deduced a solution of the question in hand, it will be necessary to go back to the original treaty between the government and the Indians now established upon this reservation, and to trace a little the manner in which the government has dealt with them in respect of the lands of which they have claimed possession and title. The treaty to which I refer was entered into on June 9, 1855 (12 Stat. 945), and afterwards ratified by the Senate and proclaimed by the President. By its first article the Indians ceded to the United States all their right, title, and claim to all and every part of the country included within certain boundaries there specified (which comprises a large amount of territory), with a provision, however:

"That so much of the country described above as is contained in the following boundaries shall be set apart as a residence for said Indians, which tract for the purposes contemplated shall be held and regarded as an Indian reservation; * * * all of which tract shall be set apart and, so far as necessary, surveyed and marked out for their exclusive use."

By article 6 it is stipulated as follows:

"The President may, from time to time at his discretion, cause the whole or such portion as he may think proper, of the tract that may now or hereafter be set apart as a permanent home for those Indians, to be surveyed into lots and assigned to such Indians of the confederated bands as may wish to enjoy the privilege, and locate thereon permanently, to a single person over twenty-one years of age, forty acres, to a family of two persons, sixty acres; to a family of three and not exceeding five, eighty acres; to a family of six persons and not exceeding ten, one hundred and twenty acres; and to each family over ten in number, twenty acres to each additional three members; and the President may provide for such rules and regulations as will

153 F.—30

secure to the family in case of the death of the head thereof, the posses-
sion and enjoyment of such permanent home and improvement thereon; and
he may at any time, at his discretion, after such person or family has made
location on the land assigned as a permanent home, issue a patent to such
person or family for such assigned land, conditioned that the tract shall not
be aliened or leased for a longer term than two years, and shall be exempt
from levy, sale, or forfeiture, which condition shall continue in force until
a state Constitution, embracing such land within its limits, shall have been
formed and the Legislature of the state shall remove the restriction: Pro-
vided, however, that no state Legislature shall remove the restriction herein
provided for without the consent of Congress: And provided, also, that if
any person or family, shall at any time, neglect or refuse to occupy or till
a portion of the land assigned and on which they have located, or shall
roam from place to place, indicating a desire to abandon his home, the Presi-
dent may if the patent shall have been issued, cancel the assignment, and
may also withold from such person or family their portion of the annuities
or other money due them, until they shall have returned to such permanent
home, and resumed the pursuits of industry, and in default of their return
the tract may be declared abandoned, and thereafter assigned to some other
person or family of Indians residing on said reservation."

The previous policy of the government was to treat the Indians as
in a state of tutelage; the government assuming and continuing its
guardianship in a manner over both their persons and property, and
in particular over such rights of property as they may have had or pos-
sessed in the lands of their primitive habitations. Generally, the gov-
ernment has so far recognized the Indians' right of occupancy in such
lands as that it will not dispossess them without their consent, although
it has been conclusively settled that the fee is in the government. This
title to the fee came from the right of discovery and the succession
to that right, which confers the authority to extinguish the Indian
title of occupancy. Says Chief Justice Marshall, in Johnson v. Mc-
Intosh, 8 Wheat. 543, 603, 5 L. Ed. 681:

"It has never been contended that the Indian title amounted to nothing.
Their right of possession has never been questioned. The claim of govern-
ment extends to the complete ultimate title, charged with this right of pos-
session, and to the exclusive power of acquiring that right."

So, in United States v. Cook, 19 Wall. 591, 593, 22 L. Ed. 210, the
court, speaking through Mr. Chief Justice Waite, says:

"The right of the Indians to their occupancy is as sacred as that of the
United States to the fee, but it is only a right of occupancy."

Yet later, in Beecher v. Wetherby, 95 U. S. 517, 525, 24 L. Ed.
440, the court says:

"But the right which the Indians held was only that of occupancy. The fee
was in the United States, subject to that right, and could be transferred by
them whenever they chose. The grantee, it is true, would take only the naked
fee, and could not disturb the occupancy of the Indians. That occupancy could
only be interfered with or determined by the United States. It is to be pre-
sumed that in this matter the United States would be governed by such con-
siderations of justice as would control a Christian people in their treatment
of an ignorant and dependent race."

And, again, in Spalding v. Chandler, 160 U. S. 394, 402, 16 Sup.
Ct. 360, 364, 40 L. Ed. 469:

"It has been settled by repeated adjudications of this court that the fee of
the lands in this country in the original occupation of the Indian tribes was

from the time of the formation of this government vested in the United States. The Indian title as against the United States was merely a title and right to the perpetual occupancy of the land, with the privilege of using it in such mode as they saw fit until such right of occupation had been surrendered to the government. When Indian reservations were created, either by treaty or executive order, the Indians held the land by the same character of title, to wit, the right to possess and occupy the lands for the uses and purposes designated."

Now, while it is true that the government can dispose of the fee, in absolute derogation of the possessory rights of the Indians, yet unless the government assumes, itself, to extinguish the Indian title, its grantee takes subject and subordinate to their possessory right. Upon the other hand, the Indian title cannot be conveyed by the Indians to any one but the United States without the consent of the latter. Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299; United States v. Alaska Packers' Association (C. C.) 79 Fed. 152. So that, in consideration of the long-settled policy of the general government, the Indians possess such a right of occupancy in and to the lands set apart to them by treaty out of their larger dominions as no one except the government itself can disturb; and the government has always, unless in exceptional cases, respected that right, and treated it as one of property.

The government having the fee of the lands upon the Umatilla reservation, and the Indians the right of exclusive occupancy and possession, the Congress has provided for allotments of such lands in severalty, but not until the consent of the Indians thereto shall have been given; nor by the act has Congress departed essentially from the stipulations of the treaty in that behalf. Looking back to the treaty, therefore, the intendment with both the government and the Indians was that the latter at some time, when developments had demonstrated their capacity to manage successfully their property affairs, should come into the ultimate title to those lands, or a portion thereof, in severalty, and be able to hold and enjoy them as citizens of the United States and of the states hold and enjoy real property; there being a joint ownership by occupancy on the part of the Indians. The fee being in the government, the allotments were had with a view to clothing the Indians with the fee in particular tracts in severalty. There was no donation or grant in the sense of disposing of the public domain to settlers thereon, but a fulfillment of treaty stipulations; the consideration for the allotments having long since been fully performed on the part of the Indians, and they having yet only to demonstrate their capacity to manage the property to entitle them to the fee absolute. To "allot" is:

"To divide or distribute, as by lot. To distribute or parcel out in parts or portions; or to distribute to each individual concerned; hence, to grant, as a portion; to give, assign, or appoint in general." Webster's Unabridged Dictionary.

So the purpose and process here was to distribute to each person concerned, in full accord with treaty regulations, that which was understood and conceded to rightfully belong to the Indians themselves, although the fee was held for them by the United States in the capacity of guardian of their property and estate; the allotment being intend-

ed as in the nature of a partition among joint owners of realty, whereby there should be set apart to each owner a single portion in severalty as and for his joint interest or property in the whole. The United States in making the allotments was dealing with the fee, and yet conceding that the Indians were entitled to it, and providing that in due time they should have it. "Allot" is not a term of sale or grant, but of apportionment of that to which the parties are entitled as of right. The Honorable William H. Taft, Solicitor General, advising. as to the allotment of lands to individual Indians, asked: "What is the Indian right of occupancy?" To which he answered:

"It is the right to enjoy the land forever, with the right of alienation limited to one alienee, the United States, or to such persons as the United States, in its capacity of guardian over the Indians, may permit."

And then, after stating the government's relation to the Indians as guardian, he makes this further observation:

"Allotments in severalty of Indian land are therefore naturally evolved from the Indian right of occupancy." 20 Opinions Attorney General, 42, 48.

Now, understanding the nature and the purpose of the allotment, we may determine as to the inheritancy. "The law governing the descent of lands and the distribution of the personal property of an intestate, wherein the tribal organization is still recognized by the government, is the law of the tribe." 22 Cyc. 119; Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49. This pertains to tribal Indians. To supplant this condition, while the government was pursuing its course of inducing the Indians to abandon their primitive habits and customs, it was deemed appropriate to enact that the laws of descent obtaining in the state of Oregon should apply to the allotments of land in severalty, and hence the act of 1885. The Supreme Court has spoken, in United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532, in part interpretation of section 5 of the act of 1887, containing provisions of similar import with those of the act of 1885 now under consideration. Referring to the term "patents," as first used in the section, the court says it was merely designed to denote "a paper or writing, improperly called a patent, showing that at a particular time in the future, unless it was extended by the President, he [the Indian] would be entitled to a regular patent conveying the fee." This patent, so called, it is provided by the act shall be of legal effect and declare that:

"The United States does and will hold the land thus allotted * * * for the sole use and benefit of the Indian to whom such allotment shall have been made, or in case of his decease, of his heirs according to the laws of the state of Oregon, and that at the expiration of said period the United States will convey the same by patent to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever."

Another patent is therefore to follow which shall invest the Indian with title absolute, divested of all trust relationship with the government, and in final discharge of the government's guardianship as it pertains to the allotment. What, then, is made descendable or inheritable? Is it the fee, or is it merely the right of occupancy, or has the government carved out of this Indian title a trust estate for them,

whereby the Indian is accorded an equity only for the time being, and is that the estate which the law declares to be inheritable?

Counsel for defendants insist that it is this latter equitable estate that is within the intendment of Congress; but with this contention I am unable to agree. As I have shown, Congress was dealing with the fee of those Indian lands with a purpose of investing that title ultimately in the Indians in severalty for their sole and exclusive ownership and management, as a citizen of the United States might own and manage property for his exclusive benefit. The scheme was by allotment among the Indians of.that to which they were entitled by treaty and by the long-continued policy of the general government. Hence the government adopted a procedure for setting aside or distributing to each Indian concerned that to which he was entitled. To accomplish that purpose in manner deemed by Congress to be to the best interests of the Indians, it was considered wise to withhold the ultimate title from them for awhile, but the scheme was for the allotment ultimately of that title; and so it was the fee with which Congress was dealing, and it was the fee concerning which the allotments were to be and were made. Such being the case, it is the fee that Congress has made inheritable according to the laws of the state of Oregon. 'The estate is therefore one of inheritance, and the right of curtesy attaches. The clause, providing "that the law of alienation and descent in force in the state of Oregon shall apply thereto after patents have been executed, except as herein otherwise provided," is best construed as a general provision to apply both to the preliminary and final patents, and the exception mentioned has relation to the withholding of the title in fee during the probationary period. Of course, no alienation can take place in the meantime if the government is to convey the fee free of all charge or incumbrance whatsoever.

It will be noted that this act of 1885 does not provide for citizenship of the allottees. That was left for the act of 1887; so that the law of inheritance applying to citizens generally would not govern the Indian respecting the inheritance of realty, unless specially provided, and such was, perhaps, the intendment of Congress by inserting the clause. This gives meaning and significance to all the language employed, and renders none of it superfluous. The general statute of 1887 provides specifically that any conveyance of the allotted land prior to the final patent shall be null and void, and that the law of descent and partition (not alienation) in force in the states or territories in which the lands lie shall apply after patents therefor, etc., which was there intended probably to limit the operation of descent and partition to the time intervening prior to the issuance of the final patent conveying the fee, for by this act the Indian was made a citizen by reason of the fact of allotment (In matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848), and no provision was necessary to make the law of alienation and descent apply to him after he had been invested with the fee. Nor am I, after a careful review of the entire subject, now of the opinion, as indicated by the case of Kalyton v. Kalyton, 45 Or. 116, 129, 74 Pac. 491; 78 Pac. 332, that the heirs of Indian allottees "take as donees of the United States and not by inheritance." My reasons are apparent from previous discussions here-

in. The leading case for the doctrine supposed to apply in the case of Kalyton v. Kalyton is Hall v. Russell, 101 U. S. 503, 25 L. Ed. 829, and is predicated of the donation act; but there the court says it was not the land that it was contemplated should descend to the heirs, but the "settler's rights only." And, again, the court says specifically: "We attach no importance to the word 'descend' as used in this section." By the death of the entryman he could not comply with the conditions as to residence and cultivation so as to entitle him to his patent; so the law provided that upon the death of such entryman his rights should descend to his heirs at law, including his widow, and that proof of compliance with the statutory conditions on their part would entitle them to patent; and so the court held that they took as donees of the government, as they very well might. This case was followed, and the doctrine thereof applied, in Quinn v. Ladd, 37 Or. 261, 59 Pac. 457. So it was said of the homestead act, in Bernier v. Bernier, 147 U. S. 242, 246, 13 Sup. Ct. 244, 245, 37 L. Ed. 152, that the object of the sections of the statute involved was ."to provide the method of completing the homestead claim and obtaining a patent therefor, and not to establish a line of descent or rules of distribution of the deceased entryman's estate." And such is the case under the timber culture act. See, Kelsay v. Eaton, 45 Or. 70, 76 Pac. 770, 106 Am. St. Rep. 662, and Cooper v. Wilder, 111 Cal. 191, 43 Pac. 591, 52 Am. St. Rep. 163.

But not so with the present act. The purpose there was to give scope and effect to the laws of descent in Oregon, which were made applicable to the allotment. I have not overlooked the case of Patawa v. United States (C. C.) 132 Fed. 893. While the distinguished jurist in that case used language which would imply that dower would not attach as it relates to the allotment, and this because it was contended for the demurrer that the right of the widow to dower involved the construction of the laws of the state, and was the exercise of a jurisdiction probate in its character, yet he says distinctly:

"The right of dower in this case depends upon the allotting act. The right exists if it can be implied from the act that the allottee's interest is with respect to dower subject to the rule that obtains in the case of estates of inheritance in general. And so the right to dower involves the construction of a federal statute. There is no question involving a construction of the laws of Oregon in the case."

And thus was the question left for determination by a construction of the allotting statute, without attempting to render the interpretation. The case is therefore not controlling.

The interpretation I have given to the act, construed in connection with the treaty, seems more in consonance with the intendment of Congress and the expectations and anticipations of the Indians. It secures, as was stipulated in the treaty of 1855, to the family, in case of the death of the head thereof, the possession and enjoyment of the permanent home and the improvements thereon. Otherwise, it might happen that the wife of a deceased allottee, or the husband of such an allottee, would be left without any estate whatsoever in any of the Indian lands upon the reservation. The allotments are made to the heads of families, being Indians or of mixed Indian blood and of the

confederated tribes settled upon the Umatilla reservation. Ordinarily, the husband is the head of the family, and the allotment is to him; none is to the wife, though the children are entitled to their allotments. So that at the death of the husband the wife is left without the benefit of any allotment, unless she is to have her dower, which will secure to her the measurable possession and enjoyment of the permanent home. Otherwise, she is left homeless and remediless, dependent wholly upon the charity of relatives and friends, with the government discharged of its guardianship. True, it may and does happen that Indian women marry white men, or Indians not of the confederated tribes, and the allotment is then to the wife as the head of the family. Hy-yu-tse-milkin v. Smith, 194 U. S. 401, 24 Sup. Ct. 676, 48 L. Ed. 1039. In such cases, under the rule here adopted, the husband becomes entitled to the curtesy. But these are exceptions, for the general rule is that intermarriage is with members of the confederated tribes, and it was the latter condition that was in view in casting the treaty and in the adoption of the legislation relative to the allotment of these Indian lands upon the Umatilla reservation to the members of the confederated tribes in severalty.

Since, therefore, the motion to strike out includes relevant and material matter with other that is impertinent, it must be overruled, and such will be the order of the court.