WHEELER v. PETITE et al.

(Circuit Court, D. Oregon. May 6, 1907.)

No. 3,057.

INDIANS—ALLOTMENTS—DOWER.

The widow of an Indian to whom an allotment of lands in severalty had been made from the Grande Ronde Indian reservation, as authorized by the treaty of January 22, 1855, and Act Cong. 1887, c. 119, 24 Stat. 388, is entitled to dower in such lands.

On Demurrer to Complaint.

The complainant, who is an Indian woman, brings this suit to determine her right to dower in certain lands situate upon the Grand Ronde Indian reservation, in the state and district of Oregon, formerly allotted to Henry Winslow, a full-blood Indian. From the allegations of the bill of complaint, it appears that the complainant intermarried with Henry Winslow in the year 1881. Subsequently, under and by virtue of the provisions of the act of Congress entitled "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes," approved February 8, 1887 (24 Stat. 388, c. 119), there were allotted to Winslow the lands alluded to. Two daughters were born to Henry Winslow and the complainant, the issue of their said marriage, who are now living, and known as Tillie Quenel, née Winslow, and Rosa Winslow. Some time during the year 1890, Winslow, without being separated or divorced from the complainant, married the defendant Annie Petite, and the issue of this marriage is one son, namely, Augustus Winslow. Winslow died in the year 1896, leaving the defendant Annie Petite and their son Augustus Winslow in possession of the allotment. Annie Petite acquired her present name, subsequently to the decease of Winslow, by intermarriage with one Petite, with whom she is now living. The complainant claims a right of dower in the said premises, as the lawful widow of Henry Winslow, and the right to pos-

sess the same jointly with the children of Winslow, namely, Tillie Quenel, née Winslow, Rosa Winslow, and Augustus Winslow, and prays that her rights in the premises be so determined and adjudicated. The defendant Annie Petite challenges the sufficiency of the complaint by demurrer, and the question presented is whether the complainant is entitled to the right of dower in and to the allotted lands.

James Cole, Asst. U. S. Atty., for plaintiff.

Martin L. Pipes and J. S. McCain, for defendant Annie Petite.

WOLVERTON, District Judge (after stating the facts). On January 22, 1855, the Calapooia, Yamhill, Clackamas, and other tribes and bands of the Indians entered into a treaty with the United States, whereby they ceded all their title to lands comprising the entire Willamette Valley to the government, with a provision that they "be permitted to remain within the limits of the country ceded, and on such temporary reserves as may be made for them by the superintendent of Indian affairs, until a suitable district of country shall be designated for their permanent home, and proper improvements made thereon." The Indians stipulated to vacate the country ceded when directed by the superintendent of Indian affairs, "and remove to the district which shall be designated for their permanent occupancy." By the fourth article it was agreed that the President might, from time to time at his discretion, cause the whole or such portion as he might think proper, of the tract that should be set apart as a permanent home of the Indians, to be surveyed into lots, and assign them to such Indians of the confederated bands as might wish to enjoy the privilege and locate thereon permanently: To a single person, over 21 years of age, 20 acres; to a family of two persons, 40 acres; to a family of three persons, and not exceeding five, 50 acres; to a family of six persons, and not exceeding ten, 80 acres; and to each family over ten in number, 20 acres for each additional three members. The President was also authorized to make rules and regulations such as would secure to the family, in case of the death of the head thereof, the possession and enjoyment of such permanent home and the improvements thereon. Other provisions are inserted, with a view to induce the Indians to remain permanently upon the land thus allotted to them, and it was designed that they should finally be entitled to the lands absolutely, without right or title in the government. The act of 1887 (24 Stat. 388, c. 119) provides:

"That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to cause said reservation, or any part thereof, to be surveyed, or resurveyed if necessary, and to allot the lands in said reservation in severalty to any Indian located thereon in quantities as follows: To each head of a family, one-quarter of a section; to each single person over eighteen years of age, one-eighth of a section; to each orphan child under eighteen years of age, one-eighth of a section; and to each other single person under eighteen years now living, or who may be born prior to the date of the order of the President directing an allotment of the lands embraced in any reservation, one-sixteenth of a section: Provided, that in case there is not sufficient land in any of said

reservations to allot lands to each individual of the classes above named in quantities as above provided, the lands embraced in such reservation or reservations shall be allotted to each individual of each of said classes pro rata in accordance with the provisions of this act."

Section 2 provides:

"That all allotments set apart under the provisions of this act shall be selected by the Indians, heads of families selecting for their minor children."

And section 5:

"That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, that the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and alloited as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: Provided, that the law of descent and partition in force in the state or territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered, except as herein otherwise provided."

It does not appear in what manner the Grande Ronde reservation was set apart to these confederated bands of Indians, but I presume that it was done through an executive order. At least, that the reservation has been regularly established is unquestioned. The general act for the allotments of lands upon Indian reservations, we may assume, was intended to carry out in the main the purposes of the treaty stipulations and agreements with the Indians—this treaty with the confederated bands of Indians of the Willamette Valley being one among many others—and one of those main purposes was to furnish a permanent home, ultimately, for the families of such Indians. The act of 1887 is in consonance with this idea. Indeed, the allotments were by that act to be made to the heads of families, and, where so made, of course, there was no allotment to the spouse. In order, therefore, to carry out the idea of affording a permanent home for the Indian family, there was a purpose, manifestly, to secure the widow in the home of a deceased head of a family by some permanent right. Dower is suited to this purpose. Many of the states and territories, perhaps most of them, at the time of the adoption of the act of 1887, had, and have now, statutory regulations respecting dower, so that it may be reasonably inferred that, by the provision of the act that the allotted lands shall descend according to the laws of the state or territory in which they shall be situated, it was the purpose of Congress that the widow should have her dower in such allotments, and thereby be measurably secured in the permanent family home. The relation between this statute and the Indian treaties preceding it is not so manifest as that which plainly exists between the treaty with the confederated tribes of Indians settled upon the Umatilla reservation

and the act of 1885, providing specially for allotments of lands pertaining to that reservation; but the act of 1887 is a reflection, with some modifications to suit general conditions, and with a view to constituting citizens out of Indian allottees, of the act of 1885, and was intended, no doubt, to conserve the same general purpose. Hence it is more readily inferable that it was the design of Congress by the act of 1887 as well to secure the widow in a measure in the enjoyment of a permanent home by according to her dower or other such right in the lands of the husband as the local, laws and statutes might have provided.

As to the nature of the allotment and of the estate allotted, I have fully determined that in the case of Parr v. United States et al. (just decided) 153 Fed. 462, and it is unnecessary that I repeat the considerations here. What I have premised in this case, read in connection with the considerations in that, affords a full solution of the present controversy.

I am of the opinion, therefore, that the complainant is entitled to a dower right in the allotment of her deceased husband, Henry Winslow, and the demurrer to the bill of complaint will be overruled.