BEAM v. UNITED STATES et al.

(Circuit Court of Appeals, Ninth Circuit. May 4, 1908.)

No. 1,535.

INDIANS—ALLOTMENT OF LANDS—RIGHT OF CURTESY IN HUSBAND OF ALLOTTEE.
Act March 3, 1885, c. 319, 23 Stat. 341, authorizing allotments of land in severalty to the Umatilla Indians in Oregon, provides that the President shall cause patents to issue to the allottees, which shall be of the legal effect and declare that the United States will hold the land for the period of 25 years in trust for the sole use and benefit of the allottee, "or, in case of his decease, of his heirs according to the laws of the state of Oregon," and that at the expiration of said period the United States will convey the same to the allottee "or his heirs as aforesaid, in fee, * * * provided that the law of alienation and descent in force in the state of Oregon shall apply thereto after patents have been executed, except as herein otherwise provided." *Held*, that such provision relating to descent applied to lands after the execution of the first so-called patent and during the 25-year period, that during such period the allottee held an equitable estate of inheritance, and that under B. & C. Comp. Or. § 5544, on the death of an Indian woman allottee during such period, leaving a husband surviving, the husband was entitled to hold the land for life as tenant by the curtesy.

Appeal from the Circuit Court of the United States for the District of Oregon.

For opinion below, see 153 Fed. 474.

Stillman & Pruitt and R. J. Slater, for appellant.
M. L. Olmstead, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. Lester Beam, represented here by his prochein ami, the appellant, was born on March 14, 1889, the illegitimate son of an Indian woman. In the year 1891 land in the Umatilla Indian reservation was allotted to his mother under Act Cong. March 3, 1885, c. 319, 23 Stat. 341. On September 21, 1890, she and the appellee intermarried. They lived together as husband and wife until January 26, 1894, when the wife died, leaving no issue living, except the said Lester Beam. A daughter born of the marriage reached the age of two years and died, shortly before the death of the mother. The appeal brings to our consideration the single question whether the appellee is tenant by the curtesy of the land so allotted to his wife during the coverture.

The act of March 3, 1885, after providing for an allotment of lands in severalty to the Indians of the Umatilla Reservation, thus proceeds:

"The President shall cause patents to issue to all persons to whom allotments of lands shall be made under the provisions of this act. and which shall be of the legal effect, and declare that the United States does and

will hold the land thus allotted for the period of twenty-five years in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state of Oregon, and that at the expiration of said period, the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, that the law of alienation and descent in force in the state of Oregon shall apply thereto after patents have been executed, except as herein otherwise provided."

Act Feb. 8, 1887, c. 119, 24 Stat. 388, commonly known as the "General Allotment Act," went into effect before allotments were made under the special act of March 3, 1885. It provided for allotments, within the discretion of the President, of all Indian reservation lands, granted citizenship to all Indians upon the completion of allotments to them, and repeated the language of the prior act in regard to the patents to be issued by the President and the nature thereof, with the amendment that after the expiration of the 25-year period the President might in any case in his discretion extend the period.

By the laws of Oregon in force at the time of and since the passage of the act of March 3, 1885, it is provided that, where property of a decedent has not been lawfully devised, the same shall descend in equal shares to his or her children and to the issue of any deceased children by right of representation; that, if there be no children, it shall descend to all his or her other lineal descendants; and it is further provided that an illegitimate child shall be considered an heir of its mother, and shall inherit or receive her property, real or personal, in like manner as if such child had been born in lawful wedlock. B. & C. Comp. §§ 5577, 5580. The law of Oregon in regard to estates by the curtesy is as follows:

"When any man and his wife shall be seized in her right of any estate of inheritance in lands, the husband shall, on the death of his wife, hold the lands for his life as tenant thereof by the curtesy, although such husband and wife may not have had issue born alive." B. & C. Comp. § 5544.

It is settled by the courts of Oregon that curtesy attaches to equitable as well as to legal estates. Gilmore v. Burch, 7 Or. 374, 33 Am. Rep. 710; Elliott v. Teal, 5 Sawy. 252, Fed. Cas. No. 4,396. We have to inquire, therefore, whether or not under the act of Congress an Indian allottee took an estate of inheritance. Construing the general allotment act, the Supreme Court, in United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532, said:

"The word 'patents,' where it is first used in this section, was not happily chosen to express the thought which it is clear all parts of the section being considered, Congress intended to express. The 'patents' here referred to (although that word has various meanings) were, as the statute plainly imports, nothing more than instruments or memoranda in writing designed to show that for a period of 25 years the United States would hold the land allotted in trust for the sole use and benefit of the allottee, or, in case of his death, of his heirs, and subsequently, at the expiration of that period, unless the time was extended by the President, convey the fee discharged of the trust and free of all charge or incumbrance. In other words, the United States retained the legal title, giving the Indian allottee a paper or writing, improperly called a 'patent,' showing that at a particular time in the future, unless it was extended by the President, he would be entitled to a regular patent conveying the fee."

It is true that by the statute of 1887 the time for issuing the final patent may be deferred, and in fact may never arrive; but in the meantime it is clear that the allottee takes, under the first so-called patent, an estate in the land allotted to him. He is given absolutely the sole and exclusive use and benefit of the land. Such a right acquired under the statute would, if the statute were silent on the subject of inheritance, descend, upon the death of the grantee, to his heirs. The Indian tribes had their own rules and customs governing the descent of land (Brown v. Steele, 23 Kan. 672; Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49), and it must have been for the purpose of removing all doubt as to the succession, and establishing the more equitable rules of descent and distribution adopted by state laws, that the provision was inserted that the so-called first patents should declare the trust for the benefit of the allottee, "or, in case of his death, of his heirs according to the laws of the state or territory where such land is located."

If this were the whole expression of the intention of Congress in regard to the inheritance of such an estate, there might be plausible ground for the argument that the words so used were words of purchase, and not of inheritance, or, in other words, that the intention was to name the heirs as cestuis que trustent, who should immediately succeed to the right of the allottee in case of his or her death, before the issuance of the final patent. But other language of the act expressive of the intention of Congress is to be found in the final proviso:

"That the law of descent and partition in force in the state or territory where such lands are situate shall apply thereto after patents shall have been executed and delivered, except as herein otherwise provided."

The appellant contends that this proviso refers to the descent of the land after the issuance of final patent, and does not affect its disposition prior to that time. But the proviso is in its terms inclusive enough to refer to both patents, and from its position in the text, following directly after and connected with the provision declaring null and void all conveyances of the allotted land before the issuance of the final patent, it is evident that its purpose is to regulate the disposition of the property upon the death of an allottee before the issuance of the final patent. It is not to be supposed that Congress, after providing for the issuance of a final patent in fee, discharged of the trust and of all charge or incumbrance, would consider it necessary to attach thereto the proviso that the descent of such property and partition thereof should be governed by the laws of the state, because such laws would, of their own force, attach from the time when the fee vested in the grantee. That proviso, therefore, as we construe the statute, applies to the descent of the property during the time it is held in trust by the United States, and by its terms the descent of the property here in controversy, on the death of the allottee, is to be governed by the law of Oregon. While, strictly speaking, the estate by the curtesy does not "descend" to the husband, it being rather in the nature of a continuation of the wife's estate, it is nevertheless regarded more in the nature of an estate by descent

than by purchase. 1 Washb. Real Property (3d Ed.) 159. And this is recognized in the statutes of Oregon, where, at the close of the chapters regulating descent and distribution, it is provided in section 5589 that:

"Nothing contained in this and the preceding chapter shall affect or impair the estate of a husband as tenant by the curtesy."

In brief, the act of Congress, as we construe it, leaves the whole disposition of the land, in case of the death of the allottee before final patent, to be governed by the state law. While in some states by statute the just and equitable rule has been adopted that the husband is not entitled to curtesy, where the wife leaves issue by a former marriage and no issue by the last marriage, unless the estate came from him or one of his ancestors (Hathon, Guardian, v. Lyon, 2 Mich. 93; Tilden v. Barker, 40 Ohio St. 411), there is no such statutory provision in the laws of Oregon. We have not overlooked the doctrine that the husband may not be entitled to curtesy in his wife's equitable separate estate of inheritance when the terms of the instrument creating the estate, either expressly or by implication, exclude him from curtesy, as announced in McCulloch v. Valentine, 24 Neb. 215, 38 N. W. 854, Mullany v. Mullany, 4 N. J. Eq. 16, 31 Am. Dec. 238, and other cases; but we find nothing in the statute to justify such a construction.

The appellant compares the estate of the allottee before the final patent to that of a donation claimant before he had completed the settlement which entitled him to patent, and cites Quinn v. Ladd, 37 Or. 261, 59 Pac. 457, in which the court denied the right of the husband of a donation settler, who died before the expiration of the residence and cultivation required by law, to hold as tenant by the curtesy. But the two cases are essentially different. The settler under the donation law held only a possessory right in the land occupied, until the completion of the four years' residence and cultivation and full compliance with all the conditions of the donation land act. Until that time he had no grant and he acquired no estate. Hall v. Russell, 101 U. S. 503, 25 L. Ed. 829. In the case of an Indian allottee there is a present grant from the time of the issuance of the first patent—an absolute grant of an estate in trust for the allottee, subject to no conditions to be complied with upon his part. The Indians were not donees of the government, and the allotment was not made as a mere act of its bounty. It was an act of partition in severalty to individual Indians of lands the title to which the United States then and for many years had held in trust for the tribe. It was an act which went into effect only upon the assent of the Indians. It was the expression of the more recent policy of the government, the purpose of which is to dissolve the tribal relation, establish the Indians in individual homes, in the possession of individual estates, ultimately to be vested in them in fee, to confer upon them the rights and impose upon them the duties of citizenship, and to make their tenure of real estate in all respects subject to the local law.

The decree is affirmed.