### Joe H. Fussell et al. v. J. B. Hail et al.

1. RELIGIOUS DISPUTE—*jurisdiction of courts with respect to.* The civil courts assume no right or power to settle disputes upon religious or ecclesiastical subjects, but follow the construction which the church courts put upon such matters.

2. RELIGIOUS CORPORATIONS—*power of church organization to unite.* It is within the inherent right of one church organization, corporately organized, to unite with another church organization of the same faith where such act of unition is not in specific disregard of charter powers, and will, in the judgment of the governing body of the church seeking to form such union, tend to the general advancement, growth and prosperity of the united church.

3. ENDOWMENTS—*when not improperly affected by union of religious corporations.* Endowments made to a religious organization are not improperly affected by a union of such organization with an-

Fussell v. Hail.

other religious organization of the same faith unless the endowments in question expressly restrict or limit the grant so as to prohibit such a union.

Bill for injunction. Appeal from the Circuit Court of Macon county; the Hon. WILLIAM C. JOHNS, Judge, presiding. Heard in this court at the November term, 1906. Affirmed. Opinion filed June 1, 1907.

**Statement by the Court.** Joe H. Fussell, T. A. Havron, John W. Parker and others filed their bill for injunction in the Circuit Court of Macon county to restrain J. B. Hail and others, as commissioners to the general assembly of the Cumberland Presbyterian Church, from taking steps toward perfecting a union of the Cumberland Presbyterian Church with the Presbyterian Church of the United States of America. A demurrer was interposed to the bill and sustained by the trial court. Fussell et al. elected to stand by their bill, whereupon the prayer thereof was denied and the bill dismissed for want of equity at the costs of the complainants. Fussell et al. appealed.

It was alleged in the bill, in substance, that said Fussell, Havron, Parker et al. were members in good standing in, and communicants of the Cumberland Presbyterian Church; that they presented the bill for injunction for themselves and on behalf of all other members in good standing in said Cumberland Presbyterian Church, who were opposed to the reunion and union of the Cumberland Presbyterian Church with the Presbyterian Church of the United States of America, who numbered more than 100,000 persons; that the said Cumberland Presbyterian Church was organized as a separate church, independent of all other, on the fourth day of February, 1810, in Dixon county, Tennessee, and had always since that time continued its separate church organization; that the cause which, in 1810, led to the separation from the Presbyterian Church of the United States of America, was the doctrines of "election" and "reproba-

tion" as taught in the Westminster Confession of
Faith of the Presbyterian Church of the United States
of America, to which confession of faith the Cum-
berland Presbyterian Church had never subscribed,
but upon the contrary held to such a modification of
such confession of faith as to eliminate therefrom the
doctrine of unconditional election and reprobation and
limited atonement, further holding that there were
and are no eternal reprobates, and that all infants
dying in infancy are saved; that said Cumberland
Presbyterian Church had congregations disseminated
through Illinois, Iowa, Missouri, Kentucky, Tennes-
see and many other western states; that said religious
society so composed was not incorporated under the
laws of any state, but was governed by a constitution
adopted in 1883, which had been followed and recog-
nized throughout the entire denomination ever since
it was so adopted; that the governmental affairs of
the church were administered by and through church
courts known as the church "session," "presbytery,"
"synod" and "general assembly"; that the session
consisted of a minister and two, or more, ruling elders;
a presbytery consisted of all the ordained ministers
and one ruling elder from each church within a given
district; a synod consisted of all the ministers and
one ruling elder from each church in a district com-
prising at least three presbyteries; while the general
assembly was the highest court of the church and rep-
resented in one body all the particular churches and
exercised jurisdiction over such matters as concerned
the whole church, and was made up of commissioners
chosen from the presbyteries; that the defendants in
the bill were also members of the said Cumberland
Presbyterian Church and as such had been chosen as
commissioners to the general assembly to meet at
Decatur, Illinois, in May, 1906; that the said assembly
so to meet at Decatur was the assembly and Decatur
the place of meeting determined upon at the preceding
meeting of the said general assembly held at Fresno,

California, in 1905; that said assembly consisted of commissioners elected from their respective presbyteries; that the powers of said general assembly were fixed by said constitution in sec. 43, which reads as follows:

"43. The General Assembly shall have power to receive and decide all appeals, references, and complaints regularly brought before it from the inferior courts; to hear testimony against error in doctrine and immorality in practice, injuriously affecting the Church; to decide in all controversies respecting doctrine and discipline; to give its advice and instruction, in conformity with the government of the Church, in all cases submitted to it; to review the records of the Synods; to take care that the inferior courts observe the government of the Church; to redress whatever they may have done contrary to order; to concert measures for promoting the prosperity and enlargement of the Church; to create, divide, or dissolve Synods; to institute and superintend the agencies necessary in the general work of the Church; to appoint ministers to such labors as fall under its jurisdiction; to suppress schismatical contentions and disputations, according to the rules provided therefor; to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this Church; to authorize Synods and Presbyteries to exercise similar power in receiving bodies suited to become constituents of those courts, and lying within their geographical bounds respectively; to superintend the affairs of the whole Church; to correspond with other Churches; and, in general, to recommend measures for the promotion of charity, truth, and holiness throughout all the Churches under its care."

It was further alleged in said bill that at the meeting of the general assembly held at Nashville, Tennessee, in 1903, a resolution was introduced and referred unanimously to the committee on overtures which provided that whereas there were before that body memorials praying the appointment of a com-

mittee to consider the advisability of a union of the Cumberland Presbyterian Church with the Presbyterian Church of the United States of America, which provided that there be appointed (and accordingly there was so appointed) a committee on Presbyterian Comity, Federation and Union, to consist of nine persons who shall do all in their power to promote closer organization and union of all branches of the Presbyterian family and report to the next general assembly; that said general assembly at Nashville, Tennessee, at its meeting in 1903, adopted a resolution that its committee of nine confer with such like committees as might be appointed by other Presbyterian bodies in regard to organization and union among members of the Presbyterian family.

It was further alleged in the bill that at the general assembly held at Dallas, Texas, in 1904, such committee so appointed reported that without any previous agreement, there was a feeling in both the Cumberland Presbyterian Church and the Presbyterian Church of the United States of America, among individuals, presbyteries and synods, in favor of such movement after the publication of the action of the Presbyterian Church of the United States of America of its act of revision or declaratory statement of 1903; that expressions of a desire for union with the Presbyterian Church of the United States of America had been made by those in authority in the Cumberland Presbyterian Church in 1810, 1811, 1812, 1813, 1860, 1867, 1873, 1885 and 1888; that the revision or declaratory statement of 1903, made by the Presbyterian Church of the United States of America, had modified the declarations contained in the confession of faith as originally expressed and held by that Church, so the objections that had been before made to it by the Cumberland Presbyterian Church could no longer be successfully made; that in essentials the original confession of faith of the Presbyterian Church of the

United States of America had been so far revised that it was the duty of the two churches to enter into a union; that this resolution was by unanimous vote made a special order of business, and a resolution adopted by a vote of 162 to 74 to submit the basis contained in the report of said committee, to the Presbyteries of the Cumberland Presbyterian Church in the usual constitutional manner, upon receiving official notification of the adoption of the said joint report by the general assembly of the Presbyterian Church of the United States of America; that said committee also further submitted a report upon such proposed union recommending that reunion or union of the two churches be accomplished as soon as the necessary steps could be taken upon the basis that the United Church be known as the Presbyterian Church of the United States of America, possessing all the legal and corporate rights and powers which the separate churches then possessed; that the union be effected on the doctrinal basis of the confession of faith of the Presbyterian Church of the United States of America as revised in 1903; that each of these assemblies should submit such basis of union to its presbyteries which should express their approval or disapproval thereof before April 30, 1905, in answer to the question, "Do you approve of the reunion and union of the Presbyterian Church of the United States of America and the Cumberland Presbyterian Church on the doctrinal basis of the confession of faith of the Presbyterian Church of the United States of America as revised in 1903, and of its other doctrinal and ecclesiastical standards?" that each presbytery should, by May 10, 1905, forward to the stated clerk of the assembly a statement of its vote on the said basis of union which should be submitted by such clerks to the general assemblies, and if the general assemblies should then find that the basis of union had been approved by the constitutional majority of the pres-

byteries connected with each branch of the church, then the same would be of binding force and both assemblies should take action accordingly; that all the ministers and churches in the two denominations should be admitted to the same standing in the united church which they may have held in their respective connections up to the consummation of the reunion; that the official records of the two churches during their period of separation should be preserved and held as making up the history of one church; that the permanent committees and boards should be so reconstructed as to represent with impartiality the views and wishes of the two bodies constituting the reunited church; that the institutions of learning, together with their endowments and other property, both real and personal, under the control of the Cumberland Presbyterian Church, should remain in charge of and be controlled by the board of trustees or other managers respectively in charge thereof, or by their successors similarly appointed or elected, so as to preserve the integrity of the institutions and maintain their then present policy.

In said bill it was further alleged that at Fresno, California, at the general assembly in 1905 of the Cumberland Presbyterian Church, there were submitted both a majority and minority report by the said committee on organic union; that the majority report stated that the special committee appointed to canvass the vote of the presbyteries upon the subject of union returned that sixty presbyteries had voted for approval of union of the two churches while fifty-one presbyteries had disapproved thereof, with two presbyteries not voting, in favor of the reunion and such majority report recommended that (whereas, the general assembly of each church had appointed a committee on reunion which said committees, after conferring together, had agreed upon a plan or basis of reunion and by joint report presented the same to their respective general assemblies in 1904, and had

Fussell v. Hail.

recommended adoption thereof, which had been adopted by the necessary vote, etc., in the Cumberland Presbyterian Church, and approved by the presbyteries in said church by a vote of sixty to fifty-one), a resolution be adopted to the effect that said reunion and union had been constitutionally agreed to by a majority of the presbyteries of the Cumberland Presbyterian Church and that the said basis of union had, for the purposes of the union, been constitutionally adopted; that at said meeting those in protest to said union offered a minority report in lieu of the majority report which minority report was defeated by a vote of 137 to 111; that upon the defeat of such minority report such general assembly at Fresno adopted a resolution adding nine new members to said committee on fraternity and union and instructed said committee so constituted (with its added members) to confer with the committee on co-operation and union of the Presbyterian Church of the United States of America with reference to adjusting details of union with the latter church.

In said bill it was charged that all reports of such committees so adopted were all and each of them without authority, *ultra vires* and void; that the general assembly, synods and presbyteries had exceeded their authority under the constitution; that the basis of union between said two churches as suggested was upon a doctrinal basis of the confession of faith of the Presbyterian Church of the United States of America, as revised in 1903, whereas the general assembly of the Presbyterian Church of the United States of America at its session in 1904, declared that "the assembly in connection with this whole subject of union with the Cumberland Presbyterian Church places on record its judgment that the revision of the confession of faith, effected in 1903, has not impaired the integrity of the system of doctrine contained in the confession taught in the

Scriptures; but was designed to remove misapprehension as to the interpretation thereof.''

In said bill it was further alleged that the value of the property of the congregations of the Cumberland Presbyterian Church was over five million dollars, besides school and publishing house property, worth about two million more; that there were nearly three thousand churches and congregations in the Cumberland Presbyterian Church; that said general assembly, acting by and through said committee on fraternity and union, was attempting and threatening to consummate the alleged illegal and unconstitutional merger and absorption of the said Cumberland Presbyterian Church with the Presbyterian Church of the United States of America and report their action in that regard to the general assembly of the Cumberland Presbyterian Church at Decatur, Illinois, and perfect such reunion unless restrained, etc.

In said bill it was further alleged that the said property of the Cumberland Presbyterian Church, so valued at more than seven millions of dollars, was during a period of ninety-five years given to said Cumberland Presbyterian Church because of its particular teachings and doctrines, and was held in trust for the preaching and extending of the principles of faith and doctrines of the Cumberland Presbyterian Church and for no other purpose, and that to perfect such reunion would be a breach of the trust aforesaid.

The bill prayed that the said action of the general assembly might be declared unconstitutional, *ultra vires* and void, and an injunction be awarded to prevent the consummation of such union with the Presbyterian Church of the United States of America.

E. B. GREEN, WILLIAM REISTER, JOE H. FUSSELL, J. J. McCLELLAN and THEO. G. RISLEY, for appellants; W. A. CALDWELL, of counsel.

JOHN M. GAUT, HUGH CREA, HUGH W. HOUSUM, HAMILTON PARKS and JOHN H. DEWITT, for appellees.

MR. PRESIDING JUSTICE RAMSAY delivered the opinion of the court.

Whether or not the confession of faith of the Cumberland Presbyterian Church and the confession of faith of the Presbyterian Church of the United States of America as modified by its declaratory statement of 1903, are identical, or in substance the same, is a question solely for the ecclesiastical courts to determine. This court should not attempt to place any construction upon the meaning of the two confessions of faith, or either of them, or compare one with the other. The civil courts of America assume no right or power to settle disputes upon religious or ecclesiastical subjects, but follow the construction which the church courts put upon such matters. In Ferraria et al. v. Vasconcelles et al., 23 Ill. 403-408, the court say that those who have submitted a matter of membership to an ecclesiastical power cannot invoke the supervisory power of the civil courts.

In Chase v. Cheney, 58 Ill. 509, where a minister was charged with omitting alleged material words in his ministration of the sacrament, it was held that the secular courts would not inquire whether the omission was an offense. That was a question for the ecclesiastical court; the civil court was no forum for such an adjudication.

In Brundage v. Deardorf, 92 Fed. Rep. 214, it was held that decisions upon ecclesiastical questions of the supreme judicatory in a religious body similar to that of the Cumberland Presbyterian Church were binding and conclusive on members and could not be reviewed in a civil court.

In Watson v. Jones, 13 Wallace, 679, the court say that under our system of jurisprudence in the United States, whenever a question of faith or ecclesiastical

rule of law has been decided by the highest court judicatory, such decision must be final and binding upon the civil courts and that such view is supported by the preponderating weight of the authorities.

Upon this particular feature of the controversy the latter case seems to have been cited approvingly by many different courts.

In Lamb v. Cain, 129 Ind. 486, it was held that where a civil right depended upon a matter pertaining to an ecclesiastical affair the civil tribunal tries the right and nothing more, taking the ecclesiastical decisions, out of which the civil right arises, as it finds them and accepts such decisions as matters adjudicated by another legally constituted jurisdiction. In this case the general conference of the church had resolved that a constitution and a confession of faith had been legally adopted (although the sufficiency of the vote was challenged) and the civil court held that the decision of the conference was binding and conclusive upon the civil court.

In the case at bar the general assembly of the Cumberland Presbyterian Church in effect determined that the confession of faith of the Presbyterian Church of the United States of America, as modified by the declaratory statement of 1903, was so far like that of the Cumberland Presbyterian Church that it was the duty of the two churches to reunite; that the two churches were of substantially similar faith. Under the authorities we are bound by the decisions of the general assembly of the Cumberland Presbyterian Church, the highest court in that church, to the effect that there is such an agreement between the systems of doctrine contained or stated in the confessions of faith of the two churches since the declaratory statement of 1903, as to warrant the union proposed.

Appellants contend, however, that even if the general assembly had power to determine all matters of doctrine or faith, yet its action looking toward such a

reunion was wholly unconstitutional, *ultra vires* and void. Appellees argue that the action taken was fully warranted by the constitution and further contend that the general assembly had inherent, as well as the constitutional right, to consummate the union. Upon the case as presented by the bill we hold that the general assembly had authority to provide for and establish a union (or reunion, as it is often called in the bill and arguments) of the Cumberland Presbyterian Church with the Presbyterian Church of the United States of America. Section 40 of the constitution of the Cumberland Presbyterian Church makes its general assembly the highest court in the church, and section 43 of such constitution gives such assembly power to concert measures for promoting the prosperity and enlargement of the church; to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine of the Cumberland Presbyterian Church, and to superintend the affairs of the whole church as well as power to decide all controversies respecting doctrine.

The effect of such sections is to make the general assembly, not only a legislative and administrative body, but one with judicial powers upon ecclesiastical questions, as well. It represents in one body all the particular churches in the Cumberland Presbyterian Church organization and constitutes one bond of union, Why is it not possible to promote the prosperity and enlargement of the church by uniting with another body that teaches a doctrine or faith identical with its own? If these two churches, in their confessions of faith and their religious teachings, are the same, then these interests may be promoted by uniting all those who preach, teach and believe in and care for those interests, the same as can be done by individuals joining their interests in co-partnerships or corporations. United action is productive of more good than divided action under the circumstances. The general assem-

bly has power to receive under its jurisdiction other ecclesiastical bodies of the same faith. This clause must be read with the clause that directs the taking of measures to promote and enlarge the church, and in our judgment the church is enlarged, and its prosperity made more sure by receiving the support of a stronger sister church. If a smaller church can be received, surely affiliation and union can be made with a stronger sister church, if thereby the church, as a religious body, is prospered and enlarged.

That many such unions have been formed among Presbyterian Church bodies, upon the faith of an implied or inherent power to do so, cannot be successfully denied.

In 1785 the synods of New York and Philadelphia took steps for the organization of a general assembly with the view to the union of all the presbyterian bodies into one, and in 1789 resolved such synods into a general assembly. In 1801, after having failed in efforts to unite with both the Reformed Dutch and the Associated-Reformed Churches, the general assembly so organized agreed upon a plan of union with the general association of Connecticut. This action seems to have been taken upon the faith of an inherent power to so act. It was from the organization so formed that the founders of the Cumberland Presbyterian Church, in 1810, withdrew because of a doctrinal difference, and took such action that the organization of the Cumberland Presbyterian Church followed.

Many kindred unions have been formed in like manner, between similar bodies, not only in the United States, but in Canada as well, and upon no different authority. Among them may be mentioned the union of the Associate Reform Church with the Associate Church in 1858, forming the United Presbyterian Church. The Independent Presbyterian Church of the Carolinas with the general assembly of the Presbyterian

Church (South) in 1863. The Old School Presbyterian Church with the New School in 1870. The Alabama Presbyteries of the Associated Reform Church with the Presbyterian Church (South) in 1867.

The general assembly of the Cumberland Presbyterian Church, when once created, had the same implied power and authority in that church that its kindred assembly had in the Presbyterian Church of the United States of America. That such general assemblies and like bodies have an implied power to unite with others of the same faith or teaching seems to be supported by the authorities and to spring from the very nature of the case.

In McGinnis et al. v. Watson et al., 41 Pa. State, 9, where a majority of a congregation, and the presbytery to which it belonged, approved of a union with the Associate Reform Synod, but a minority disapproved and claimed the church building because of their adherence to the opinions and principles of the original church, it was held that as authority to legislate upon doctrine was one of the powers of the body voting by majority vote to form the union, the act of union was not irregular.

In Ramsey's Appeal, 88 Pa. State, 60, in a case where it was voted by a majority to form a union with another body holding substantially the same doctrines, it was held not to be irregular.

In Central University of Kentucky v. Walters, Executrices, (Ky.) 90 S. W. Rep. 1066, where because of a local sentiment a school was endowed to be located at Richmond, Kentucky, and afterward it was consolidated with the Center College at Danville, Kentucky, and the school at Richmond abandoned, upon a suit brought to cancel a part of the endowment made to the Richmond School, it was held that the consolidation did not annul the endowment.

As has been already intimated the very nature of the case suggests an inherent power in the general

assembly to consummate the reunion sought to be en-
joined, if such act will, in the judgment of such as-
sembly, tend to the general advancement, growth and
prosperity of the united church. There is no such
thing as a popular vote in either the Cumberland
Presbyterian Church or the Presbyterian Church of
the United States of America. The constitution itself,
quoted from, was first made an organic law and pro-
mulgated by the general assembly, and not by a vote
of the church membership. The supreme power of
the association is in its general assembly and its au-
thority to act for the whole church has remained un-
disputed and unquestioned for many years.

Appellants in their protest against reunion say
that: "There is no constitutional provision for the
dissolution of our church or merging it into a com-
munion having and holding different doctrines. It is
only expressly provided to receive into our commun-
ion other ecclesiastical bodies whose doctrine and sys-
tem of government conform to ours," and "That said
basis of union was acted upon by the general as-
sembly and the presbyteries under the representation
that the so-called revision of the confession of faith
of the Presbyterian Church of the United States of
America had materially changed the system of doc-
trine contained in the confession of faith of said Pres-
byterian Church of the United States of America be-
fore such reunion, whereas, in truth and in fact, the
revision of the confession of faith effected in 1903 by
the Presbyterian Church of the United States of Amer-
ica has not impaired the integrity of the system of
doctrine contained in the confession, but was designed
to remove misapprehensions as to the proper inter-
pretation thereof."

The statements quoted suggest very strongly that,
in the minds of those in protest, the only obstacle in the
way of the proposed reunion was the alleged doctrinal
differences. Suppose in the case at bar appellants

should admit in the record that the confessions of faith in the two church bodies were identically the same, would there still be opposition to the reunion upon constitutional or any other grounds? Would not such an admission take from the argument of appellants all its force and vitality? This doctrinal question or matter of creeds has been adjudicated by the highest ecclesiastical court having jurisdiction, and a determination thereof made to the effect that the creeds are in harmony, and by such adjudication this court is bound as fully as though all doctrinal differences were admitted by answer no longer to exist. The cause of the separation from the parent body by the Cumberland Presbyterian Church having been declared by the highest judicatory in the latter, to have passed away and the difference in creeds no longer to exist, there remains in our judgment no legal barrier to the reunion. There may now be one church with common judicatories, instead of two preaching the same faith and having organizations differing in name alone.

We see no ground for the contention made by appellants to the effect that a special trust concerning church or school property, the result of gifts, conveyances, or devises, etc., will be violated by the consummation of the proposed union of the two associations. Clause six of the concurrent declarations which the two general assemblies agree to adopt upon such consummation and upon which the general assembly of the Cumberland Presbyterian Church contemplates the reunion expressly provides that: "The institutions of learning, together with the endowments and other property, real and personal, owned by them, which are now under the control of the Cumberland Presbyterian Church, shall remain in charge of and be controlled by the Board of Trustees, or other managers, respectively now in charge of such institutions, endowments and property, or by their successors sim-

ilarly appointed or elected," etc. This clause seems fully to safeguard the rights of the churches, schools and associations in the use of their separate properties and to enable them to continue in control thereof through appointments or elections conducted as heretofore. As we read the bill there is no allegation therein setting up any condition expressed in any deed, gift, or devise that would be violated by the consummation of the reunion. In order that the purpose of a donor or grantor may operate to prevent the consummation of the proposed reunion it would have to amount to an expressed condition imposing a restriction or limitation upon the grant. This is, in effect, the holding in Downen v. Rayburn, 214 Ill. 342. Central University of Kentucky v. Walters, Executrices, (Ky.) 90 S. W. Rep. 1066-1070.

The demurrer to the bill was properly sustained, and the decree of the court dismissing such bill is affirmed.

*Affirmed.*