## HALL v. RUSSELL.

1. The act of Congress approved Sept. 27, 1850 (9 Stat. 496), commonly known as the Donation Act, granted to each person having the requisite qualifications the right to settle upon and cultivate a tract of public land in Oregon not in any case exceeding in extent one section, or six hundred and forty acres, in order that he might, upon complying with all the prescribed conditions and making proof thereof, be entitled to a patent for such tract.

2. The title to the soil does not vest in the settler before the conditions have been fully performed. *Quære,* Does it pass from the United States until the requisite final proof of their performance be made?

3. A., an unmarried man, settled, in 1852, upon a half-section of public land in Oregon, and, after residing thereon less than a year, died. *Held,* that he had no devisable interest in the land.

APPEAL from the Circuit Court of the United States for the District of Oregon.

The facts are stated in the opinion of the court.

*Mr. William W. Chapman* and *Mr. Timothy D. Lincoln* for the appellants.

*Mr. George H. Williams, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a bill in equity filed by the heirs of the devisee of James L. Loring, deceased, and the administrator of Loring with the will annexed, to obtain the legal title to a tract of three hundred and three acres of land near Portland, Oregon, which, as the complainants claim, the defendants hold in trust for them. The facts material to the view we take of the case are as follows: —

In the month of April, 1852, Loring, a single man, settled

on the land in dispute with a view to becoming its owner under the operation of the Oregon Donation Act. 9 Stat. 496. He had all the qualifications necessary to enable him to take and hold under the act, but died after a residence on the land of less than a year, leaving a will, executed in Ohio in 1849, whereby he devised all his estate remaining after the payment of some small legacies, to Samuel Parker Hall, then of Cincinnati, Ohio, but now deceased.

On the death of Loring, Joshua Delay claimed the land as a settler in behalf of himself and his wife, Sarah Delay, and after a contest with the representatives of Loring before the officers of the Land Department, the heirs of the Delays succeeded in obtaining a patent. Much litigation ensued between them and the heirs of Loring about the title, but, finally, all the estate of both these parties was transferred to the present defendants, in whom it is now vested, but with full knowledge, before the transfer, of the claim of the complainants. The theory of the present suit is that Loring, by his settlement, acquired an estate in the lands which passed by his will, and that the heirs of the Delays took title under the patent issued to them in trust for the devisee of Loring as the real owner of the property. The court below dismissed the bill for the reason, among others, that Loring had no devisable estate in the lands when he died, and, consequently, his devisee took nothing by the will.

The case, therefore, in this aspect, presents the question directly whether the heirs of a settler under the Oregon Donation Act, who died before the expiration of the four years' residence and cultivation required, took by descent from the settler, or as donees of the United States. If by descent, it is conceded the settler had a devisable estate. If as donees, he had not.

The sections of the act material to the determination of this question are the fourth, fifth, sixth, seventh, eighth, and twelfth. The fourth is as follows: —

"SECT. 4. That there shall be, and hereby is, granted to every white settler or occupant of the public lands, American half-breed Indians included, above the age of eighteen years, being a citizen of the United States, or having made a declaration according to law, of his intention to become a citizen, or who shall make such declaration on or before the first day of December, eighteen hundred and

fifty-one, now residing in said Territory, or who shall become a resident thereof on or before the first day of December, 1850, and who shall have resided upon and cultivated the same for four consecutive years, and shall otherwise conform to the provisions of this act, the quantity of one-half section, or three hundred and twenty acres of land, if a single man, and if a married man, or if he shall become married within one year from the first day of December, 1850, the quantity of one section, or six hundred and forty acres, one-half to himself and the other half to his wife, to be held by her in her own right; and the surveyor-general shall designate the part inuring to the husband and that to the wife, and enter the same on the records of his office; and in all cases where such married persons have complied with the provisions of this act, so as to entitle them to the grant as above provided, whether under the late provisional government of Oregon, or since, and either shall have died before patent issues, the survivor and children, or heirs of the deceased, shall be entitled to the share or interest of the deceased in equal proportions, except where the deceased shall otherwise dispose of it by testament duly and properly executed according to the laws of Oregon. *Provided*, that no alien shall be entitled to a patent to land, granted by this act, until he shall produce, to the surveyor-general of Oregon, record evidence that his naturalization as a citizen of the United States has been completed; but if any alien, having made his declaration of an intention to become a citizen of the United States, after the passage of this act, shall die before his naturalization shall be completed, the possessory right acquired by him under the provisions of this act, shall descend to his heirs-at-law, or pass to his devisees, to whom, as the case may be, the patent shall issue. *Provided further*, that in all cases provided for in this section, the donation shall embrace the land actually occupied and cultivated by the settler thereon. *Provided further*, that all future contracts by any person or persons entitled to the benefit of this act, for the sale of the land to which he or they may be entitled under this act, before he or they had received a patent therefor, shall be void. *Provided further*, however, that this section shall not be so construed as to allow those claiming rights under the treaty with Great Britain, relative to the Oregon Territory, to claim both under this grant and the treaty, but merely to secure them the election, and confine them to a single grant of land."

The fifth provides "that to all white male citizens of the United States . . . emigrating to and settling in said Territory

between the first day of December, 1850, and the first day of December, 1853, . . . who shall . . . comply with the foregoing section, and the provisions of this law, there shall be and hereby is granted the quantity of one quarter-section . . . if a single man; or if married . . . the quantity of one half-section . . ."

Sect. 6 provides that within three months after the survey has been made, or after the commencement of the settlement, each settler shall notify the surveyor-general of the precise tract claimed by him, and that the surveyor-general shall enter a description of such claims in a book to be kept by him for that purpose.

Sect. 7 provides that, within twelve months after the survey or settlement, each person claiming a donation right shall prove to the surveyor-general that the settlement and cultivation have been commenced, specifying the time of the commencement; and that he shall, after the expiration of four years from the date of his settlement, prove in like manner the fact of continued residence and cultivation required by the fourth section ; and upon such proof being made, the surveyor-general, or other officer appointed by law for that purpose, shall issue certificates under such rules and regulations as may be prescribed by the Commissioner of the General Land-Office, setting forth the facts in the case, and specifying the land to which the parties are entitled. And the said surveyor-general shall return the proof so taken to the office of the Commissioner of the General Land-Office, and if the said commissioner shall find no valid objections thereto, patents shall issue for the land according to the certificates aforesaid, upon the surrender thereof."

" SECT. 8. That upon the death of any settler before the expiration of the four years continued possession required by this act, all the rights of the deceased, under this act, shall descend to the heirs-at-law of such settler, including the widow, where one is left, in equal parts, and proof of compliance with the conditions of this act up to the time of the death of such settler, shall be sufficient to entitle them to the patent."

Sect. 12 provides that all persons claiming by virtue of settlement and cultivation commenced subsequently to Dec. 1,

1850, shall make affidavit that the land is for their own use and cultivation.

The rights of Loring and those who claim under him all depend on sect. 4. Whatever he took was by virtue of the grant there made. If that section gave him no devisable estate before the completion of the required four years' residence and cultivation, he had none. The other sections may be resorted to if necessary to get at the meaning of this, but this alone, when its meaning is ascertained, fixes the limit of the donation made to him.

The anomalous condition of affairs in Oregon Territory when this act was passed has been heretofore brought to our attention. *Stark* v. *Starrs,* 6 Wall. 402 ; *Lamb* v. *Davenport,* 18 id. 307 ; *Stark* v. *Starr,* 94 U. S. 477 ; *Barney* v. *Dolph,* 97 id. 652. For many years the inhabitants had been without any government except that which they had themselves organized for their own protection. The ownership of the soil on which they lived was in dispute between the United States and Great Britain. Under the operation of treaty stipulations for a joint occupation of the Territory, extensive settlements had grown up, and the people in governing themselves had adopted land laws which made occupancy the basis of ownership as between settlers. While waiting for the contesting sovereign claimants to determine which of the two should be the acknowledged owner of the soil, they contented themselves with regulating their rights of occupancy as between each other, trusting to the bounty of the government under whose sole dominion they should ultimately fall, for a grant of title to the land itself. The first of these acts was passed in 1844. Laws of Oregon, 1843 to 1849, 77. Under this only free males, over the age of eighteen, who would be entitled to vote if of lawful age, and widows, were entitled to hold a " claim," save that a married man under eighteen was not debarred. A claim was also confined to six hundred and forty acres or less. Permanent improvements and continuous occupation and cultivation were essential to the preservation of the rights conferred. Following this was the " Land Law," contained in the organic law of the provisional government which went into operation in 1846. Ter. Stat. Oregon (1851), 32, art. 3. This law relaxed somewhat

the stringency of the former act as to actual occupation, and extended the privilege of establishing claims to all residents of the Territory. . By the act of Congress creating a territorial government for Oregon, approved Aug. 14, 1848 (9 Stat. 323), all laws theretofore passed in the Territory making grants of land, or otherwise affecting or incumbering the title to lands, were declared void, but all other laws in force under the authority of the provisional government were continued in operation so far as they were not incompatible with the constitution or the principles and provisions of that act. All laws passed by the legislative assembly of the Territory were to be submitted to Congress, and if disapproved were to be null and void. Sect. 6.

Doubts having arisen whether, after the establishment of the territorial government, the land law of the provisional government was in force, an act of the territorial legislature was passed Sept. 12, 1849, expressly declaring it to be so, and some additional provisions were made consistent with the title of the new act, which was " An Act to prevent injuries to the possession of settlers on public lands." Ter. Laws (1851), 246. By sect. 5 of this act it was provided that " land claims shall descend to, and be inherited by the heirs-at-law of the claimant, in the same manner as is provided by law for the descent of real estate." On Sept. 26, 1849, " An act respecting wills" was passed by the territorial legislature. Ter. Stat. (1851), 274. By this act every person of twenty-one years of age and upwards, of sound mind, might, by " last will, devise all his estate, real, personal, and mixed, and all interests therein, saving to the widow her dower." Before the passage of the act of September 12, if a person died in the lawful possession of a land claim, it formed part of his personal estate, and was to be disposed of by his executors or administrators for the benefit of his legal heirs. Laws of Oregon, 1843 to 1849, 61.

It was in the midst of this condition of affairs that the Donation Act was passed. Congress had the right, on assuming undisputed dominion over the Territory, to confine its bounties to settlers within just such limits as it chose. The settlers had no title to the soil, and the legislation under the provisional government, as well as that by the territorial legislature, had

no other effect than to regulate possessory rights on the public domain in the absence of congressional interference.

The opening words of sect. 4 are "that there shall be, and hereby is, granted." This is appropriate language in which to express a present grant, but as was well remarked by Mr. Justice Field for the court in *Missouri, Kansas, and Texas Railway Company* v. *Kansas Pacific Railway Company* (97 U. S. 491), "It is always to be borne in mind, in construing a congressional grant, that the act by which it is made is a law as well as a conveyance, and that such effect must be given to it as will carry out the intent of Congress." There cannot be a grant unless there is a grantee, and consequently there cannot be a present grant unless there is a present grantee. If, then, the law making the grant indicates a future grantee and not a present one, the grant will take effect in the future and not presently. In all the cases in which we have given these words the effect of an immediate and present transfer, it will be found that the law has designated a grantee qualified to take, according to the terms of the law, and actually in existence at the time. Thus, in *Rutherford* v. *Greene's Heirs* (2 Wheat. 196), the grantee was Major-General Greene; *Lessieur* v. *Price* (12 How. 59), the State of Missouri; in *United States* v. *Arredondo* (6 Pet. 691), Arredondo & Son; in *Fremont* v. *United States* (17 How. 542), Alvarado; in *Schulenburg* v. *Harriman* (21 Wall. 44), the State of Wisconsin; in *Leavenworth, Lawrence, and Galveston Railroad Company* v. *United States* (92 U. S. 733), the State of Kansas; and, without particularizing further, it may be said generally that in the swamp-land cases and all the internal-improvement-grant cases, where for the most part the question has arisen of late, if a grant has been held to take effect presently, the State or some corporation, having all the qualifications specified in the act, has been designated as grantee. In other words, when an immediate grant was intended an immediate grantee, having all the requisite qualifications, was named.

Coming then to the present case we find that the grantee designated was any qualified "settler or occupant of the public lands . . . who shall have resided upon and cultivated the same for four consecutive years, and shall otherwise conform to

the provisions of the act." The grant was not to a settler only, but to a settler who had completed the four years of residence, &c., and had otherwise conformed to the act. Whenever a settler qualified himself to become a grantee, he took the grant and his right to a transfer of the legal title from the United States became vested. But until he was qualified to take, there was no actual grant of the soil. The act of Congress made the transfer only when the settler brought himself within the description of those designated as grantees. A present right to occupy and maintain possession, so as to acquire a complete title to the soil, was granted to every white person in the Territory having the other requisite qualifications, but beyond this nothing passed until all was done that was necessary to entitle the occupant to a grant of the land. Whether the fee passed out of the United States before the claim was "proved up," it is not necessary now to consider. For the purposes of the present suit it is enough to show that the occupant got no title himself, beyond that of a mere right of possession, until he had completed his four years of continued residence and cultivation.

That such was the clear intention of Congress we think is manifested in many provisions of the act. Thus, where married persons " have complied with the provisions of the act, so as to entitle them to the grant as above provided, whether under the late provisional government of Oregon, or since, and either shall die before patent issues, the survivor and children or heirs of the deceased shall be entitled to the share or interest of the deceased in equal proportions, except where the deceased shall otherwise dispose of it by testament, duly and properly executed according to the laws of Oregon." This evidently related to such married persons as had completed their four years' residence and cultivation, and had done the other things required in the mean time; that is to say, had given notice of the precise tract claimed (sect. 6), and had proved the commencement of their settlement and cultivation (sect. 7). These were the provisions to be complied with " so as to entitle them to a grant." As there could be no grant until there was some person entitled to receive it, the conclusion would seem to be irresistible that, under this provision, married settlers had no estate in the land which they could devise by will, until from being

qualified settlers only they had become qualified grantees. Having completed their settlement, and nothing remaining to be done but to get their patent, their estate in the land was one they could devise by will, or which would go to the surviving husband or wife and children or heirs of a deceased married person. Not so, however, with the mere possessory rights which preceded a compliance with the provisions of the act so as to entitle the settlers to their grant of the land.

Again : " No alien shall be entitled to a patent for land, granted by this act, until he shall produce to the surveyor-general of Oregon record evidence that his naturalization as a citizen of the United States has been completed ; but if any alien, having made his declaration of intention to become a citizen of the United States, after the passage of this act, shall die before his naturalization shall be completed, the possessory right acquired by him under the provisions of this act shall descend to his heirs-at-law or pass to his devisees, to whom, as the case may be, the patent shall issue." An alien who had declared his intention to become a citizen, or who should do so before Dec. 1, 1850, was a qualified settler, but he was not a qualified grantee until he had completed his naturalization. As no patent could be issued to him before his naturalization, provision was made for the disposition of the " possessory right " which one who had declared his intention, after the passage of the act, could acquire as an authorized settler. By the requisite residence and cultivation accompanied by the prescribed preliminary notice and proof of claim and settlement, the alien settler could perfect his right to a patent as soon as he completed his naturalization, but until he was in a condition to "prove up" for a patent, his rights in the land were " possessory " only.

Another provision is equally significant : " All future contracts by any person entitled to the benefit of this act, for the sale of the land to which he may be entitled under this act before he or they have received a patent therefor, shall be void." This must refer to sales after the necessary residence and cultivation were complete, because the grant was only to a settler " who shall have resided upon and cultivated the same for four consecutive years." This implies continuous residence

and cultivation by the person or persons who make the claim. There is no provision by which the possession of one can be added to that of another, so as to complete the requisite term. The grant was to the occupant who had himself conformed to the provisions of the act. The sale of a possessory right could have no other effect than that of an abandonment of the settler's "claim" and a grant to the purchaser of the right to enter upon the abandoned lands and begin a new settlement of his own.

This intention is even more distinctly shown in sect. 5, which being *in pari materia* with sect. 4 may be resorted to as in some degree showing the meaning of both sections. There the language is, "that to all white male citizens . . . who shall in all other respects comply with the foregoing section, . . there shall be and hereby is granted," &c. This indicates clearly that there was to be no grant except to persons who, by complying with the provisions of the act, had qualified themselves to take.

We conclude, therefore, that under sect. 4 there was no grant of the land to a settler until he had qualified himself to take as grantee by completing his four years of residence and cultivation, and performing such other acts in the mean time as the statute required in order to protect his claim and keep it alive. Down to that time he was an authorized settler on the public lands, but not a grantee. His rights in the land were statutory only, and cannot be extended beyond the just interpretation of the language Congress has used to make known its will.

This brings us to the consideration of sect. 8, which, in substance, provided that if a settler died before the expiration of the required four years' continued possession, all his rights should descend to his heir-at-law, including his widow, if he left one, and that proof of his compliance with the conditions of the act up to the time of his death should be sufficient to entitle them to the patent.

Here is a plain indication that the right of the settler before the expiration of his four years' continued possession was something less than a title in fee to the land, for the provision is not that the *land* shall descend, but the settler's *rights* only. Had it been supposed that the title was already in the settler, subject only to defeasance, if the conditions subsequent to the

grant should not be performed, we cannot but think that provision would have been made for a transfer of the land free of the conditions, instead of only the settler's rights. The object of Congress undoubtedly was to allow a settler's heirs to succeed to his possessions and thus keep his rights alive. But for some such provision all rights of the settler would have been lost by his death. As the law required full four years' residence by the person who claimed the grant, if no provision and been made for a continuance of his possession the land would have become vacant on his death and open for a new settlement by a new settler, if the law authorizing new settlements still remained in force. Hence it was provided that the possessory rights of a deceased settler should go to his heirs, and that they might get the land on making the requisite proof, without further residence and cultivation of their own. Their title to the land was to come, not from their deceased ancestors, but from the United States. The title, it is true, was granted to them by reason of the possessory rights of their ancestor, but these were rights which he could not transfer, and which passed to them under the statute without any act of his. On his death his heirs became qualified grantees. Whether they took immediately on his death or after proof of his compliance with the provisions of the act while in life, need not be decided. It is enough for this case that when their ancestor died he had nothing in the land which he could transmit to them, and that what they afterwards got came from the United States and not from him. All his rights in the land were dependant on his completion of the four years' possession, but in consideration of what he had done Congress made his heirs the special objects of its bounty if he died before his own grant had been secured. We attach no importance to the word "descend," as used in this section. In sect. 4 the word selected to convey substantially the same idea was "entitled." The thing done was to give the heirs of a settler the benefit of his rights and to designate them as the recipients of the bounty of the government, instead of him.

We have not overlooked the fact that by the territorial enactments of Oregon a settler's claim might descend to his heirs as real estate, and that his possessory rights might be disposed of

by will.   But all these enactments are in conflict with the act
of Congress, and, therefore, inoperative.   The heirs of the set-
tler took only such title as Congress gave them.   The territo-
rial government could not add to or take from that grant.   It
is not contended that under the act of Congress a settler might
devise his interest in the land unless the fee passed to him
before his death.

It follows from this that Loring at the time of his death had
no devisable estate in the land, and that the heirs of his devisee
cannot maintain this suit.   This makes it unnecessary to con-
sider any of the questions that have been argued.

*Decree affirmed.*