Argued December 2, 1915, affirmed February 1, 1916.

## STANSBERY *v.* FIRST M. E. CHURCH.

(154 Pac. 887.)

**Dedication—Parol Dedication not Binding Prior to Date of Donation Certificate.**

1.    Under the provisional Constitution of this state, one could not grant a binding parol dedication of land to a church organization, prior to the date of the certificate under the donation land claim law, passed by Congress on September 27, 1850 (9 Stat. 496, c. 76), for the reason the land claimant did not have title to the land to dedicate.

**Estoppel—Deeds—After-acquired Property—Quitclaim.**

2.    Section 4 of the donation land claim law (Act of September 27, 1850, 9 Stat. 496, c. 76), expressly provides, "All future contracts, by any person or persons entitled to the benefit of this act, for the sale of the land to which he or they may be entitled under this act, before he or they have received a patent therefor, shall be void," and where a claimant of land under the provisional Constitution entered into an oral contract to convey such land before the passage of the donation land claim law, which contract was evidenced by the execution of a quitclaim deed after the passage of the act and void thereunder, such agreement was enforceable against such claimant or his heirs after the receipt by him of a donation certificate under the act, notwithstanding such certificate or patent did not of itself pass title to the proposed grantee.

**Deeds—Definition of "Etc." Following Recital of Purpose of Deed.**

3.    The meaning of the abbreviation "etc." in a deed, following the words "for the purpose of a parsonage, church," if accorded any meaning at all, signifies "and other like purposes."

**Religious Societies—Deed of Conveyance for Church Purposes—"Perpetual Trust."**

4. For a deed to create a perpetual trust by setting forth the use and purpose for which the same is given, it is necessary that the deed specify a purpose that is exclusive, and by appropriate language express or import a perpetual use of the land for such purpose; as, for example, the land is conveyed for the purpose of a church and parsonage "only," or "forever," or "none other," or "for no other purpose."

**Religious Societies—Conveyance of Land for Church Purpose—Trust.**

5. Where a conveyance contained a recital that the land conveyed was "for the purpose of a parsonage, church, etc.," without indicating how long that user was to continue, such recital did not create a trust compelling the use of the land conveyed for such purposes only, or for no other purpose, since the language employed in the deed does no more than to express the motive of the grantors, or to announce the intention of the grantee, and the words used are not appropriate to create a charitable trust so as to require the premises conveyed to be used for *all* time for church and parsonage purposes only.

**Deeds—Construction of Restrictive Clauses in Conveyances of Estates in Lands.**

6. Words indicating an exclusive purpose and signifying permanency must appear to fetter the land with the burden of an exclusive use, for the law not only favors the vesting of estates, but when the fee is conveyed, all doubts should, as a rule, be resolved in favor of a free use of the property and against restrictions.

**Religious Societies — Conveyance for Church Purposes — Length of User as Full Pay.**

7. Where a deed contained this restriction, that the land conveyed was to be used for "the purpose of a parsonage, church, etc.," and the consideration for such conveyance partially was that the grantee was to so use the land, a user in conformity with such recital for more than 60 years fully satisfies such obligation, because the rule is firmly established that a long-continued use operates as full payment.

[As to right of religious corporation to acquire title by adverse possession, see note in **Ann. Cas. 1915C, 773.**]

From Multnomah: WILLIAM N. GATENS, Judge.

In Banc.     Statement by MR. JUSTICE HARRIS.

This is a suit by S. A. Stansbery, C. W. Gay, John Foott, Lot Taylor, W. H. Beharrel and J. P. Finley against the First Methodist Episcopal Church, a corporation, and A. M. Smith, G. F. Johnson, J. L. Hartman, Phillip Buchner, J. P. Rasmussen, T. S. McDaniel,

John Corkish, James Bradshaw, J. K. Gill and A. King Wilson, as trustees of said corporation, and Frank L. Loveland, as pastor thereof, and it involves lot 8, the north half of lot No. 7, the west 20 feet of lot 1, and the west 20 feet of the north half of lot 2, in block 23, of the City of Portland, Oregon. The property is located at the corner of Third and Taylor Streets, and is commonly known as the Taylor Street Church. The plaintiffs are members of the First Methodist Episcopal Church of Portland, and the defendants are the First Methodist Episcopal Church, a corporation, the trustees of the corporation and the pastor of the church. The persons and bodies vested with authority according to the laws of Methodism are: The general conference, the annual conference, the quarterly conference, the official board, the trustees, the bishop, the district superintendent, and the pastor. The general conference is the supreme law-making body and enacts the laws, rules and regulations for the Methodist Episcopal Church; the annual conference is next in point of authority; the quarterly conference is. the governing body for a church; the official board with certain limitations takes the place of the quarterly conference during the interim between sessions of the latter body. The personnel of the official board and the quarterly conference is the same. The trustees hold the property for the society. The general conference selects and assigns the bishops who are vested with power to consolidate societies, fix the boundaries of districts, and make appointments of preachers. The district superintendent "presides over the. quarterly conference when present." Upon the consolidation of two or more societies "the duty and responsibility of regulating the place where the principal activities of the church should take place and the public wor-

ship should be conducted" are imposed "upon the quarterly conference with the consent of the pastor." The plaintiffs are seeking to enjoin the defendants from closing the "church edifice at the corner of Third and Taylor Streets, and from preventing the plaintiffs and the other members of the said congregation from entering the same and holding religious services therein, and that they be enjoined from selling, leasing or otherwise disposing of, or using the said property, except for a house of public worship, or from otherwise or in any other manner diverting the said property from the uses to which it was dedicated and for which it is held in trust by the said defendants."

A Methodist mission church was established in 1848, and for a number of years was the only Methodist church in Portland. On November 5, 1850, Daniel H. Lownsdale, Stephen Coffin and William W. Chapman executed and delivered to James H. Wilbur, the pastor of the church, a writing as follows:

"This indenture made and entered into this 5th day of November, A. D. 1850, between Stephen Coffin, Daniel H. Lownsdale, and William W. Chapman, proprietors of Portland, Washington County, Oregon territory, of the first part, and James H. Wilbur, trustee of the Methodist Episcopal Church of the same place, of the other part, witnesseth, the party of the first part for and in consideration of the sum of one dollar and divers other good causes to them, there and thereunto moving doth release, confirm and quitclaim unto the said party of the second part the following described town property in the said town of Portland, to wit: Lots Nos. one (1), two (2), six (6), seven (7) and eight (8), in block No. twenty-three (23), in the said town for the purpose of a parsonage, church, etc. And the party of the first part covenants to and with the party of the second part that if at any time thereafter they or either of them shall obtain a fee-simple title to said property from the United States, they will con-

vey the same to the party of the second part by deed of general warranty. In testimony the party of the first part have hereunto set our hands and seals the day and year aforesaid."

The five lots cover a little more than the north half of block 23; block 23 is bounded on the east by Second Street, on the north by Taylor Street and on the west by Third Street. On March 11, 1852, Daniel H. Lownsdale filed on land, including block 23, under the terms of the act of Congress of September 27, 1850, commonly called the donation law. On September 10, 1853, James H. Wilbur assigned all his interest in the lots by making the following writing:

"I hereby relinquish, assign, make over and convey all my right, title and interest to the within described lots to Clinton Kelly, A. A. Durham, Perry Prettyman, Albert Kelly, John D. Dickenson, Samuel Nelson and P. G. Buchanan, trustees of the church property within described in the City of Portland, Oregon territory."

On October 17, 1860, a donation certificate was issued to Daniel H. Lownsdale reciting that he was entitled to a patent, but a patent was not issued until June 6, 1865, being subsequent to his death, which occurred in May, 1862. On June 1, 1867, the trustees of the church filed articles of incorporation, which recited:

That the name assumed by the corporation is the "First Methodist Episcopal Church in Portland, Oregon," and that the object "of this corporation shall be to continue the church organizations on lots Nos. 1, 2, 7 and 8 in block 23 in the City of Portland, to erect a meeting-house thereon, and to hold said premises in trust, that they shall be used, kept, maintained and disposed of as a place of divine worship for the use of the ministry and memberships of the Methodist Episcopal Church in the United States of America, subject to the discipline, usage and ministerial opportunity of

said church as from time to time authorized and declared by the General Conference of said church, and the annual conference in whose hands the said premises are situated. Provided, however, that the trustees of said house and premises shall at all times permit such ministers and preachers belonging to the Methodist Episcopal Church as shall from time to time be duly authorized by the General Conference of the ministers of said church or by the annual conference, to preach and expound God's Holy Word and to execute the discipline of the church and to administer the sacrament therein, according to the usages of the church.''

On April 15, 1870, James H. Wilbur and wife executed and delivered to the ''trustees of the Methodist Episcopal Church in Portland'' a deed confirming the instrument signed September 10, 1853, by James H. Wilbur. On September 20, 1873, the heirs of Daniel H. Lownsdale conveyed ''all of the northerly half (being 100 feet by 200) of block numbered twenty-three (23) as designated upon the maps or plats of said city in common use,'' upon the express condition that the land shall not be divided into different parcels, but shall be forever used as a site for a Methodist church building, with Sunday-school room, a parsonage, and never as a site for two or more distinct church buildings or for any secular purposes; and it was provided that if any of the conditions be broken the property should revert to the heirs who were to have the right to enter and take possession of the land. In 1877 and 1878, for the aggregate sum of $1,000, the heirs of Daniel H. Lownsdale quitclaimed to the board of trustees of the First Methodist Episcopal Church all their right, title and interest in lots 1, 2, 7 and 8 in block 23. On April 4, 1884, the ''Grace Methodist Episcopal Church in Portland, Oregon,'' was organized and incorporated. On March 6, 1888, ''for the purpose of enlarging and

better defining the objects, undertakings, purposes and powers of said corporate trustees, * * and in some respects to change the objects, undertakings and purposes set forth in the articles of incorporation of said Methodist Episcopal Church in Portland, Oregon, filed May 31, 1867," the trustees of the First Methodist Episcopal Church filed supplemental articles of incorporation which recite that:

"It is the intention and purpose of this corporation to perpetually maintain a Methodist Episcopal Church on" the land now owned at Third and Taylor Streets; that "the corporation shall have full power to sell and convey by warranty deed when so authorized by the quarterly conference of the said First M. E. Church in Portland, Oregon, any property belonging to said church, and held in trust by said corporate trustees, except" the property at Third and Taylor Streets, which "shall not be sold or conveyed by said trustees or their successors, unless such power and authority be given them by filing other and additional supplemental articles of incorporation granting such authority in accordance with the discipline of said church."

The First Methodist Episcopal Church at Third and Taylor Streets and the Grace Methodist Episcopal Church at Twelfth Street continued as separate societies until the meeting of the annual conference held in September, 1912, at Ashland, Oregon, when the two churches were united and consolidated under the name of First Methodist Episcopal Church, by order of Richard J. Cooke, a bishop of the Methodist Episcopal Church of the United States of America presiding at the annual conference of 1912. The order of consolidation had been preceded by the appointment of committees by the two churches, conferences of the committees, reports from these conferences favoring a union of the two churches, giving notice of the proposed union to members of both churches, and adop-

tion by the quarterly conference of each church of the reports recommending a union. Soon after the order of consolidation, the property owned by the Grace Methodist Episcopal Church was transferred to the First Methodist Episcopal Church, and the former ceased to exist as an organization. The church building at the corner of Twelfth and Taylor Streets, formerly known as Grace Church, was closed, and the combined congregation worshipped at Third and Taylor where all the church activities were conducted for a time; at the end of a few months the principal services were transferred to the Twelfth Street church; and after a short period the Third and Taylor Street building was made the principal place of worship, only to be followed by a second transfer to Twelfth and Taylor.

The quarterly conference of the First Methodist Episcopal Church at a meeting held on October 13, 1913, authorized the trustees "to arrange for the holding of our chief services at Twelfth and Taylor Streets," and also to arrange "for the conduct of such services at Third and Taylor Streets as may be necessary in order to comply with the law with reference to the use of said property for church purposes." Complying with the order given by the quarterly conference, the trustees determined that:

"Beginning with Sunday morning October 19, 1913, we hold our services at Twelfth and Taylor Street, and that our regular services thereafter shall be held at Twelth and Taylor Street, and also, until further plans are made, we arrange to hold a mid-week prayer service each week and a preaching service each Sunday evening at Third and Taylor Street."

A part of the congregation who had been worshipping at the Third Street church declined to go to Twelfth Street when the first transfer was made, and

a like result followed the second transfer.   Referring
to the plan "to provide services at Third and Taylor
Streets for Sunday evening and for prayer meeting
on Thursday night," complaint was made to the quar-
terly conference that "certain brethren did not see fit
to conform to that action and have held services in
the morning."   Acting on "reports to the effect that
the people worshipping at Third and Taylor were or-
ganizing Ladies' Aid Societies and were considering
the employment of a deaconess, etc., Bishop Cooke re-
quested the district superintendent to officially notify
the people that no such organization can be effected
excepting under the authority of the official board, and
with the approval of the pastor."   On January 6, 1914,
a petition was presented to the quarterly conference
requesting that body to "recommend the restoration
of the services and self-government of the church at
Third and Taylor Streets upon a satisfactory basis,
the details of which shall be outlined by our resident
bishop."   Many earnest but unavailing attempts were
made by all parties concerned to adjust the differences
arising out of the consolidation of the two church or-
ganizations and the transfer of the "chief activities"
to Twelfth Street.   The building at Third and Taylor
Streets was finally closed and locked, the plaintiffs
were not permitted to conduct services in the building,
and then this suit was commenced.   The decree of the
trial court was for the defendants, and the plaintiffs
appealed.                                       Affirmed.

For appellants there was a brief over the names of
*Mr. Martin L. Pipes, Mr. John M. Pipes, Mr. George A.
Pipes* and *Messrs. Sinnott & Adams,* with an oral argu-
ment by *Mr. Martin L. Pipes.*

For respondents there was a brief over the names of *Mr. John B. Cleland* and *Mr. E. A. Baker,* with an oral argument by *Mr. Cleland.*

MR. JUSTICE HARRIS delivered the opinion of the court.

Summarizing the detailed statement already made, the case presented here is one where a society of Methodists established a mission church in 1848, constructed a house of worship at the corner of Third and Taylor Streets in 1850, and was incorporated in 1867 as the "First Methodist Episcopal Church in Portland, Oregon"; in 1884 the "Grace Methodist Episcopal Church of Portland, Oregon," was organized, and its house of worship was located at Twelfth and Taylor Streets; each society was a constituent body of the Methodist Episcopal Church of the United States of America, and was subject to the customs, usages, and discipline of Methodism; the two societies continued to exist separately until 1912, when they were regularly and by order of competent ecclesiastical authority consolidated, and the Grace Methodist Episcopal Church was merged into the First Methodist Episcopal Church, the former ceasing to exist, and the property owned by it being transferred to the latter; all the church activities were transferred to Twelfth Street, the building at Third Street was closed, and services were not permitted to be held in that building; a number of the members of the First Methodist Episcopal Church as it existed prior to the consolidation of the two churches and who had worshipped at Third Street refused to go to Twelfth Street; the plaintiffs claim that the building at Third Street cannot be lawfully closed, and they therefore are attempting to enjoin the defendants from closing the building.

The substance of the argument made for plaintiffs in an able brief filed by erudite counsel is: That the realty was conveyed to James H. Wilbur, as trustee of the First Methodist Episcopal Church, burdened with a trust which required that the land shall be used perpetually "for the purpose of a parsonage, church, etc."; and that the plaintiffs, who are members of the church and beneficiaries of the trust, are entitled to have the trust enforced by a court of equity.   The contention of plaintiffs is founded upon the claim that the title which the defendant church holds to the land is in its final analysis traceable to Daniel H. Lownsdale. The defendants deny that the property is held subject to any trust, and they also take the position that the corporation traces its title to the land to the heirs of Daniel H. Lownsdale, and not to the ancestor; and that no estate was passed or created by the writing signed by Lownsdale, Coffin and Chapman on November 5, 1850, because neither one of them possessed any title to the land at that time.

Before attempting to state our conclusions, it may be of interest to call attention to the customs prevailing in 1850 and the regulations observed at that time concerning lands.   On July 5, 1843, the inhabitants of Oregon, assembled in mass meeting held at Champoöick, agreed to adopt certain laws and regulations "until such time as the United States of America extend their jurisdiction over us," and Article VIII of the regulations provided for the election of a recorder who was required to "record all boundaries of land presented for that purpose."   On July 2, 1845, the legislative committee adopted, and on July 26, 1845, the people ratified at the polls, certain "rules and regulations, until such time as the United States of America extend their jurisdiction over us."   Article III of "the

rules and regulations," which were adopted in 1845 and are historically known as the provisional Constitution of Oregon, permitted a person to establish a claim to land by designating the extent of his claim by natural boundaries or marks at the corners and upon the line of the claim, and recording the extent and boundaries of the claim in the office of the territorial recorder. Citizens of the United States and those of Great Britain held joint possession of the country under a treaty between the two nations of October 20, 1818, which was continued in force by the convention of August 6, 1827. The line dividing our possessions and those of Great Britain west of the Rocky Mountains was concluded on June 15, 1846, when what is now Oregon was definitely brought within the domain of the United States. On August 14, 1848, Congress passed an act to establish the territorial government of Oregon, in which the laws then existing under the provisional government were continued and declared to be operative, but by the terms of Section 14 of the act "all laws heretofore passed in said territory making grants of land, or otherwise affecting or encumbering the title to lands, shall be, and are hereby declared to be, null and void": Act Aug. 14, 1848, c. 177 (9 U. S. Stats. at Large, 323). Congress did not pass any law permitting the acquirement of title to lands in Oregon territory until September 27, 1850, when the donation law (Act Sept. 27, 1850, c. 76 [9 Stat. 496]) was enacted: *Lownsdale* v. *Parrish,* 62 U. S. (21 How.) 290, 16 L. Ed. 80. Section 4 of the donation law, as originally enacted, expressly provided that:

"All future contracts, by any person or persons entitled to the benefit of this act, for the sale of the land to which he or they may be entitled under this act, before he or they have received a patent therefor, shall be void": 1 L. O. L., p. 48.

It will be noted that the rules of the provisional government permitted the occupancy of lands upon compliance with certain regulations; the territorial act of 1848 expressly declared that laws previously passed in the territory affecting lands were void; and no rule affecting title to lands and possessing the compelling force of a law was passed until the enactment of the donation law on September 27, 1850, and that act rendered void all future contracts if made "before he or they have received a patent therefor"; and therefore neither Lownsdale nor either of his associates owned any title to the land in 1850, although they asserted and exercised the right of possession according to the then recognized and prevailing customs of the country. Although not until September 27, 1850, was any law in existence which permitted the acquirement of title, and while contracts made after September 27, 1850, and before patent was received, were prohibited by the donation law as first enacted, nevertheless, conveyances and contracts to convey made before September 27, 1850, were enforced by the courts against grantors who subsequently obtained title under the donation law: *Lamb* v. *Davenport,* 18 Wall. 307 (21 L. Ed. 759); *Stark* v. *Starr,* 94 U. S. 477 (24 L. Ed. 276); *Parker* v. *Rogers,* 8 Or. 184, 189.

Daniel H. Lownsdale filed on the land under the provisions of the donation law on March 11, 1852, and on October 17, 1860, he received a donation certificate which recited that he was entitled to a patent and, as stated in *Barney* v. *Dolph,* 97 U. S. 652 (24 L. Ed. 1063):

"When the right to a patent once becomes vested in a settler under the law, it was equivalent, so far as the government was concerned, to a patent actually issued": *Hall* v. *Russell,* 101 U. S. 503 (25 L. Ed. 829); *Quinn* v. *Ladd,* 37 Or. 261 (59 Pac. 457).

The moment the beneficial title was vested in Daniel H. Lownsdale on October 17, 1860, when the donation certificate was issued to him, a contract for a conveyance of the land, if made by him before September 27, 1850, when the donation law was passed, could have been enforced so as to secure the transfer of an afteraquired title, even though a United States patent did not issue until June 6, 1865, or about 3 years after the death of Daniel H. Lownsdale, which occurred in May, 1862.

Daniel H. Lownsdale never signed any contract or conveyance affecting the land in dispute, except the instrument dated November 5, 1850, quitclaiming five lots to James H. Wilbur as trustee; and the defendants argue that this writing was void because it was a future contract prohibited by the express terms of the donation law. The plaintiffs answer the defendants by contending that the evidence shows that prior to September 27, 1850, the grantors orally dedicated the land for "the purpose of a parsonage, church, etc."; and also that the evidence leads to the necessary inference that James H. Wilbur and the grantors made an oral agreement prior to September 27, 1850, the terms of which were afterward reduced to writing on November 5, 1850, and that therefore the agreement was not a future contract within the meaning of the donation law.

1. Considering the acts done prior to September 27, 1850, in connection with any asserted technical parol dedication, as ruled in *Carter* v. *Portland,* 4 Or. 340, 344, they "could not in this case be admitted to establish a dedication." Prior to September 27, 1850, neither Lownsdale nor his associates "had any title to or interest in the land whatever," except a possessory right which was recognized only by the usages and cus-

toms of the country: *Lownsdale* v. *Parrish,* 62 U. S. 290,
293 (16 L. Ed. 80); *Leland* v. *Portland,* 2 Or. 47, 49.

It is fair to assume that some kind of an understand-
ing was had before September 27, 1850, but there is no
evidence of the terms of an oral agreement, unless it be
said that the writing of November 5, 1850, furnishes the
evidence.   John Flynn, a Methodist minister, known to
pioneer history as Father Flynn and 98 years of age at
the time of the trial, testified that he met James H. Wil-
bur, who was also known as Father Wilbur, in Portland
on September 19, 1850, and that Father Wilbur was at
that time constructing a church on the land described in
the writing of November 5, 1850; that the building was
not finished until some day in the following October
when the structure was dedicated by a Congregational
minister preaching in the morning, Father Flynn
preaching in the afternoon, and Father Wilbur in the
evening.   It is reasonable to conclude, therefore, that
some oral agreement was entered into before com-
mencing the construction of the building, and if that
conclusion is correct it necessarily follows that the
agreement was prior to September 27, 1850, and con-
sequently not prohibited by the donation law.   There
is also in evidence an old map, known as the Brady
map, which was made some time in 1850 from the field-
notes of a survey made in the spring of that year.
References to this map appear in *Carter* v. *Portland,*
4 Or. 340, 344; *Lownsdale* v. *Portland,* 1 Or. 397, 408
(Fed. Cas. No. 8579, Deady's Rep. 39, 47); *Portland*
v. *Whittle,* 3 Or. 126 (note); *Leland* v. *Portland,* 2 Or.
47; *Lang* v. *Portland,* 75 Or. 385 (147 Pac. 378).   A
number of blocks which are now used for public pur-
poses are colored on this map; the north half of block
23, including lots 1, 2, 7 and 8, but not including lot
6, is colored, and plaintiffs rely upon this circum-

stance in aid of the contention urged by them. Even though it be assumed that Lownsdale and his associates recognized this map before September 27, 1850, that fact would not operate as a dedication because they did not own any land to dedicate: *Lownsdale* v. *Parrish,* 62 U. S. 290, 293 (16 L. Ed. 80); *Carter* v. *Portland,* 4 Or. 340, 344. The map may, however, be considered in connection with the claim that an oral agreement was made before September 27, 1850, and that the terms of the agreement appear in the writing of November 5, 1850.

2. For the purpose of this discussion we shall assume, but do not decide, that an oral agreement was made prior to September 27, 1850, and that the instrument of November 5, 1850, serves as a memorial of that agreement. The immediate effect of the writing was to pass to Wilbur as trustee the right of possession only. The covenant to deliver a warranty deed when Lownsdale obtained a fee-simple title from the United States was one which could have been enforced against him when he received the donation certificate on October 17, 1860, or the heirs could have been compelled to carry out the covenant after 1862, when the ancestor died. The making of an agreement before September 27, 1850, and the subsequent issuance of a donation certificate or patent did not of themselves and by their own force pass any title to James H. Wilbur, trustee, or his successor of First Methodist Episcopal Church, although the agreement, certificate, and patent made Lownsdale or his heirs liable to pass the title according to the terms of the agreement if the trustee or his successor wished to enforce the obligation. The defendant corporation does not claim title from Daniel H. Lownsdale, but it asserts that it derived its title from the heirs as owners, and not as mere conduits. If the

heirs were conduits only, then it is because of an agreement to convey by their ancestor at a time when he had no title to the land. The conveyance signed by the heirs on September 20, 1873, was made upon defined conditions subsequent; but, by the terms of the deeds made in 1877 and 1878, those conditions subsequent were abolished, and the heirs completely relinquished all their interest to the First Methodist Episcopal Church, and therefore, if the heirs be considered as owners and not as conduits of the title, the land passed to the defendant corporation without the burden of any trust.

While it is doubtful whether the writing of November 5, 1850, considered as an agreement made before September 27, 1850, even though it was followed by a user of the land, had the effect of impressing the realty with a trust which the heirs in conjunction with Wilbur or his successors could not revoke, nevertheless we shall assume, but do not decide, that the writing of November 5, 1850, exerts the same effect that would have resulted if, after he received his donation certificate, Lownsdale had made a warranty deed describing the same land, stating the same consideration, and containing the same recital: "For the purpose of a parsonage, church, etc.," found in the writing of November 5, 1850.

In passing, it may be of interest to note how the property has been used since 1850. The church, as erected in 1850, faced Taylor Street; in about 1860 it was enlarged by a cross-addition on the rear, and in 1869 was moved so as to face Second Street, the present brick church having been completed. After the old church was moved to Second Street, on lots 1 and 2, it was rented for secular purposes. In 1851 James H. Wilbur sold lot 6, and afterward the title was quieted in a suit against the heirs and administrator of Daniel H. Lownsdale. On April 26, 1892, the First Methodist

Episcopal Church conveyed a part of lots 1 and 2 "to the A. O. U. Temple Association," so that the land first described herein is all that remains of the five lots described in the writing of November 5, 1850. The sum of $1,000, which was paid to the Lownsdale heirs for the deeds made in 1877 and 1878, was borrowed by the First Methodist Episcopal Church from Father Wilbur. A part, but not all, of the land has been used for church purposes since 1850, until a short time before the commencement of this suit. It is a significant circumstance that James H. Wilbur, one of the four men who knew the terms of any agreement made before September 27, 1850, and who undoubtedly knew the meaning intended by the words found in the writing of November 5, 1850, sold lot 6 as early as 1851 without any protest or objection so far as shown by the evidence; and it was James H. Wilbur, too, who furnished the money to procure the deeds from the Lownsdale heirs.

3. We now come to a consideration of the meaning and legal effect of the words "for the purpose of a parsonage, church, etc.," appearing in the instrument of November 5, 1850. The quoted language is important because it is the very basis of the contention made by plaintiffs. If the abbreviation "etc." is to be accorded any meaning at all, it signifies "and other like purposes": *Naylor* v. *McColloch,* 54 Or. 305 (103 Pac. 68). Conveyances containing words relating to a specified use of the land transferred may, according to their legal effect, be divided into four classes: (1) Where a condition subsequent is created, as in *Seeck* v. *Jakel,* 71 Or. 35 (141 Pac. 211, L. R. A. 1915A, 679) ; *School Dist. No.* 21 v. *Wallowa County,* 71 Or. 337 (142 Pac. 320); (2) where a conditional limitation is prescribed, examples appearing in *Reformed Dutch Church* v. *Harder,* 34 N. Y. St. Rep. 645 (58 Hun, 605, 12 N. Y.

Supp. 297); *Henderson* v. *Hunter,* 59 Pa. 335; (3) where a trust is declared, illustrations being found in *Alden* v. *St. Peter's Parish,* 158 Ill. 631 (42 N. E. 392, 30 L. R. A. 232); *Sohier* v. *Trinity Church,* 109 Mass. 1; *Mills* v. *Davison,* 54 N. J. Eq. 659 (35 Atl. 1072, 55 Am. St. Rep. 594, 35 L. R. A. 113); *Brown* v. *Caldwell,* 23 W. Va. 187 (48 Am. Rep. 376); and (4) where the motive of the grantor is announced or the intention of the grantee is revealed, without stating a condition, or prescribing a limitation, or creating a trust, or imposing an obligation of any kind. *Downen* v. *Rayburn,* 214 Ill. 342 (73 N. E. 364, 3 Ann. Cas. 36), typifies the fourth class of cases. The plaintiffs do not contend that the instant case presents either a condition subsequent or a conditional limitation; but the question for decision is whether the conveyance falls in the third or in the fourth class of cases.

4. Upon an examination of the numerous adjudications, including the citations relied upon by plaintiffs, it will be found that, as a general rule, where a conveyance is held to create a trust, of a kind which a court of equity will preserve and continue, the language of the deed not only specifies the purpose for which the land is to be used, but also expressly states, for example, that the realty shall be used for the purpose "only," or "forever," or "for no other purpose," or shall be held "in trust" for a defined purpose. The contention of plaintiffs is that the land itself must be used for a specified purpose, and that it must be so used perpetually. The plaintiffs cannot prevail, unless the deed (1) specifies a purpose which is exclusive, and (2) by appropriate language expresses or imports a perpetual use of the land itself for that exclusive purpose. No words indicating permanency appear in the instrument of November 5, 1850; the writing does not say that the land

is conveyed for the purpose of a church and parsonage "only" or "forever," or "none other," or "no other," or "for no other purpose," and therefore the instant case is not analogous to *Raley* v. *Umatilla County,* 15 Or. 172 (13 Pac. 890, 3 Am. St. Rep. 142); nor like *Albany College* v. *Monteith,* 64 Or. 356 (130 Pac. 633); and is easily distinguishable from *Nelson* v. *Monitor Congregational Church,* 74 Or. 162 (145 Pac. 37).

5. The conveyance here does no more than to state that the realty is transferred "for the purpose of a parsonage, church, etc.," without indicating how long that user shall continue.    In *Supervisors of Warren County* v. *Patterson,* 56 Ill. 111, land had been conveyed "for courthouse and other county buildings"; a suit was commenced to enjoin a sale of the land; and, quoting at length from the opinion, the court said:

"The only remaining question is, as to the effect of the clause in the contract to convey the block, and which, it is not denied, is also contained in the deed executed by Collins.    The deed conveys the absolute fee, without any conditions or restrictions whatsoever.    The power of alienation is not limited or confined in any way.    Had the grantors in the deed imposed as a condition of the sale, that the block should be used for county buildings and for no other purpose, they perhaps, might invoke the power of a court of chancery to restrain a threatened sale of it, but the facts show that the grantors received the price demanded for the property, abating nothing, on the ground that the purchase was made for the purpose of erecting upon it county buildings, and it was quite immaterial to them to what purpose the block would be devoted, they having received full price for it.    It, no doubt, was the intention of appellants, when the purchase was made, to devote it as expressed in the deed, but that formed no part of the consideration, nor was it the inducement to the grant.    Subsequent events may have admonished those authorities, that the financial condition of the county

did not justify an expenditure such as contemplated when the purchase was made, and that the best interests of the county required a sale of the property. We fail to see anything in the transaction to take from them the power expressly conferred upon them by statute, to sell the land. There is no covenant in the deed that the land shall be devoted to a particular purpose, but by its terms the county became possessed of an absolute estate in fee simple to the land, uncontrolled by any condition, restriction, limitation or reservation, whatever. If A buys a lot of ground of B and it is declared in the deed that he purchases it as a site for a mill or other operative establishment, the fee being conveyed to him, he has the undoubted right to dispose of it without carrying out his intention. But if a grant be made by A to B on condition B erects on the land granted a certain structure, and he fails so to do, the land might revert to the grantor. But it is needless further to argue the case. Here was an unqualified sale of the fee in this block; it became vested in the county, and appellants, as their lawful agents, have full right and authority to sell it, and should not have been enjoined from so doing.''

It appears from the quotation that the grantors were paid money for the land, and that the conveyance was not a gift. The same rule, however, was applied without any modification to a case where the deed was quite like the one here. In *Downen* v. *Rayburn,* 214 Ill. 342 (73 N. E. 364, 3 Ann. Cas. 36), the deed made on July 28, 1856, recited that William R. Downen and wife, ''for and in consideration of the sum of one dollar,'' sold to the trustees of the Industry Congregation of the Cumberland Presbyterian Church a parcel of land ''to be used for a church location''; a church was erected and remained on the land until 1904, when it was removed. In 1901 the land was conveyed to Rayburn. The land had not been used for church purposes for several years. prior to the transfer to Ray-

burn. It will be noticed that in *Downen* v. *Rayburn,* the consideration expressed is "the sum of one dollar," and in the instant case it is "the sum of one dollar and divers other good causes"; and yet when speaking of the words "to be used as a church location" the court says:

"There is nothing in the words in question to indicate that the premises conveyed were to be used as a church location for any particular length of time."

The doctrine was reaffirmed in *Walker* v. *Illinois C. R. R. Co.,* 215 Ill. 610 (74 N. E. 812), and in *Weihe* v. *Lorenz,* 254 Ill. 195 (98 N. E. 268). Other authorities give support to the principle announced in the Illinois cases: *Beach* v. *Haynes,* 12 Vt. 16; *Fuquay's Heirs* v. *Trustees of Hopkins Academy,* 22 Ky. Law Rep. 744 (58 S. W. 814); 2 Devlin, Deeds (3 ed.), p. 1829. See, also, *Fussell* v. *Hail,* 134 Ill. App. 620, 636; *Rankin R. B. Church* v. *Edwards,* 204 Pa. 216 (53 Atl. 770; *Cushman* v. *Church of the Good Shepherd,* 14 Pa. Co. Ct. 26; *Hardy* v. *Wiley,* 87 Va. 125 (12 S. E. 233); *City* of *Huron* v. *Wilcox,* 17 S. D. 625 (98 N. W. 88, 106 Am. St. Rep. 788); *Fitzgerald* v. *Modoc Co.,* 164 Cal. 493 (129 Pac. 794, 44 L. R. A. (N. S.) 1229); and the note to *Doan* v. *Vestry of the Parish of the Ascension,* as reported in 7 L. R. A. (N. S.) 1119. The language employed in the instrument of November 5, 1850, does no more than to express the motive of the grantors or to announce the intention of the grantee; the words used are not appropriate for the creation of a charitable trust so as to require the land to be used for all time for church and parsonage purposes only.

6. Words indicating an exclusive purpose and signifying permanency must appear in order perpetually to fetter upon the land the burden of an exclusive use, and sound reason underlies and gives stability to the rule.

The law not only favors the vesting of estates, but when the fee is conveyed all doubts should, as a rule, be resolved in favor of a free use of the property and against restrictions: *McElroy* v. *Pope*, 153 Ky. 108 (154 S. W. 903, 44 L. R. A. (N. S.) 1220); *Hutchinson* v. *Ulrich*, 145 Ill. 336 (34 N. E. 556, 21 L. R. A. 391); *Adams* v. *First Baptist Church*, 148 Mich. 140 (111 N. W. 757, 12 Ann. Cas. 224, 11 L. R. A. (N. S.) 509), citing *Downen* v. *Rayburn*, 214 Ill. 342 (73 N. E. 364, 3 Ann. Cas. 36). It was appropriately said in *Griffits* v. *Cope*, 17 Pa. 96:

"There is a very palpable distinction between a gift of land from motives of charity, and a dedication of land to charitable uses; and there are most intrusive reasons giving a judicial bias in favor of satisfying the motive without establishing a perpetual dedication. Our law discourages the fettering of estates and putting them into mortmain, and therefore favors the construction which relieves from restraints upon alienation. And it seems unreasonable to suppose that a devisor even means that his heirs shall get back the land in such cases, except when he says so; or that, amidst the rapidly changing opinions of society, he means that his opinions shall be imbibed by others just as he left them, and shall forever withstand the changes necessarily incident to the progress of society; or that he means that no change in the number, circumstances, and habits of the people shall ever justify any sort of conversion of the gift. It would seem contrary to public policy to favor a construction that would give to a man, who died a hundred or a thousand years ago, the control of land that ought to be controlled by the present generation. Such an intention ought to be expressed, not implied. When we look at the varied institutions of the last few centuries, and at the constant and rapid changes which are going on in the circumstances, habits, opinions, and institutions of our own age, we see how unreasonable are many perpetual dedications of

land, and how much caution there should be in imply-ing an intention to create perpetuities."

We are not unmindful of the statement in *Chapman* v. *Wilbur,* 4 Or. 362, 364, that "the grant here was an absolute grant to the defendant in trust for a certain purpose specified"; but that remark was *obiter dictum,* because the case was decided and ended the very moment the court determined that the deed did not contain a condition subsequent.

7. The writing of 1850 presents itself in yet another aspect. The conveyance signed by Lownsdale, Coffin and Chapman may or may not have been a donation; any conclusion that it was a pure gift must rest upon remote inferences. Borrowing the language used by counsel for plaintiff during the trial, one of the motives inducing the transfer may have been "for the purpose also of promoting his enterprise of selling lots" and "it was good business for them to do that." If it be conceded that the transfer was made in consideration of the grantee using the land for "the purpose of a parsonage, church, etc.," then the price for the deed has been paid and the obligation fully satisfied by using the land for church and parsonage purposes for more than 60 years, because the rule is firmly estab-lished that a long-continued use operates as full pay-ment: *Sumner* v. *Darnell,* 128 Ind. 38 (27 N. E. 162, 13 L. R. A. 173); *Jeffersonville, M. & I. R. R. Co.* v. *Barbour,* 89 Ind. 375; *Hunt* v. *Beeson,* 18 Ind. 380; *Higbee* v. *Rodeman,* 129 Ind. 244 (28 N. E. 442); *Mead* v. *Ballard,* 7 Wall. 290 (19 L. Ed. 190). The conveyance of November 5, 1850, contains nothing which will now prevent the First Methodist Episcopal Church from leasing, selling or otherwise disposing of the land at Third and Taylor Streets.

It will be recalled that the supplemental articles of incorporation, which were filed in 1888, purport to restrict the right of the trustees to sell the property at Third and Taylor Streets by declaring that the land "shall not be sold or conveyed by said trustees or their successors, unless such power and authority be given them by filing other and additional supplemental articles of incorporation granting such authority in accordance with the discipline of said church." The brief filed for plaintiffs refers to the supplemental articles of incorporation, but no point is made concerning their legal effect, the whole argument dealing with the character of the estate created by the writing of November 5, 1850. The defendants contend that the supplemental articles have no binding effect because there was no statute which provided for filing supplemental articles until 1891, when what is now Section 6808, L. O. L., was enacted. The brief for defendants does not argue that the supplemental articles are not binding if properly filed. The record, however, does not present a situation which requires a determination of the legal effect of the articles filed in 1888. The supplemental articles go no further than to declare that the trustees cannot sell or convey the land at Third and Taylor. There was no intention existing at the time of the commencement of this suit to sell the land, and for that reason we do not now attempt to ascertain the effect which results from filing the supplemental articles. It is true that nearly every motion or resolution passed and nearly every step taken, whether by the board of trustees or the official board or the quarterly conference, contemplated either a sale or a lease or a mortgage of all or a part of the Third Street property; but it is also true that all previous plans were rescinded when the quarterly con-

ference adopted the Loveland resolutions on April 6, 1914. Article III of the so-called articles of consolidation signed by the joint committee of the two churches stipulates that the church building for the consolidated organization shall be located at Twelfth and Taylor Streets; and Article IV provides:

"That the old church property, corner of Third and Taylor Streets, be kept separate and leased or improved so as to be made as productive as possible, the entire net revenue from this property to be used under the direction of the board of trustees of the consolidated church for church purposes. After five years' time, from date of consolidation, unless the consolidated church requires the full income in payment of its improvement obligations, the board of trustees are directed to distribute at least half of the net income for city church extension and other missionary or charitable work in the Methodist Episcopal Church."

The Loveland resolutions reaffirm the original articles of consolidation and provide for the selection of trustees to whom the land at Third and Taylor Streets shall be conveyed "to be perpetually held in trust by said trustees for the support of Methodist City Church Extension in the City of Portland, the revenue from same to be expended according to Article IV of the original agreement of consolidation, which agreement was dated July 30, 1912, and signed by the joint committees of the two churches in interest." Trustees were chosen and a deed was executed, but the deed was annulled by order of the quarterly conference because of the commencement of this suit. It must be admitted that the deed itself is perhaps broader than the resolutions authorizing its execution, and contains a provision which contemplates the possibility of a sale by the trustees; but such sale can be made "only upon written application to the quarterly conference of said

First Methodist Episcopal Church in Portland, Oregon, and an order made by said quarterly conference for the sale thereof, a majority of the members of the quarterly conference concurring, and the pastor and district superintendent of this district consenting thereto.'' The trustees who had been selected pursuant to the Loveland resolutions had not applied for permission to sell the property, nor had the quarterly conference granted or even planned to grant permission to sell, and therefore we are not now called upon to adjudicate any questions arising out of the supplemental articles of incorporation.

While our conclusions result in an affirmance of the decree, we think that it will be just and fair for the litigants to pay their own disbursements. Around the old Taylor Street Church cling recollections which cover most of life's journey and sound every note in the gamut of human sentiment for some of those who worshipped there so long; and this in part accounts for the earnest contentions made by plaintiffs. Furthermore, even after the consolidation of the two societies the church authorities in various ways acted upon the assumption that the land at Third Street was burdened with a trust; the condition of the title to the land was not free from doubts; and in view of all the circumstances surrounding the parties we think it is equitable that the decree be without costs or disbursements in this court.

The decree of the Circuit Court is affirmed, but without judgment for costs and disbursements in this court.

AFFIRMED.

MR. JUSTICE EAKIN not sitting.